# VAN TASSEL REAL ESTATE & LIVESTOCK COMPANY v. CITY OF CHEYENNE, ET AL.

(No. 1912; February 18, 1936; 54 Pac. (2d) 906)

334

For the appellant, there were briefs and the cause was argued orally by *John U. Loomis* and *James A. Greenwood* of Cheyenne, Wyoming.

336

For the respondent, there was a brief by *Ellery, Hunter,* and *Ferrall* of Cheyenne, and oral arguments by Messrs. *Ellery* and *Ferrall.*

*John U. Loomis* and *J. A. Greenwood* in reply.

Per Curiam.

This is an action by plaintiff to enjoin defendant The City of Cheyenne (which only needs to be men-

tioned among the defendants) from diverting water to which plaintiff claimed to be entitled, and to recover damages for wrongful diversion. The following facts appear:

The City of Cheyenne is a municipal corporation, located in southeastern Wyoming, was incorporated about 1877, and ever since that time has gradually grown until it had a population of about 17,000 people according to the census of 1930. Immediately northwest of the city is located what was formerly known as Fort D. A. Russell, but is now known as Fort Francis E. Warren, with a population of about 3,500 or more, originally established in 1867. The climate in Wyoming and throughout the Rocky Mountains is semi-arid; the precipitation of rain and snow is light, irregular and uncertain as to time. Commencing with about 1930 or 1931, a period of drouth settled over southeastern Wyoming, which became more and more severe from time to time, reaching its height in 1933 and lasting at least through a part of 1934. The stream from which the city takes its water for various municipal purposes is Crow Creek, which runs easterly toward and to Cheyenne. Its direct tributaries are Middle Crow Creek and North Crow Creek, which join what is called Main Crow Creek a short distance from a place called Silver Crown, some 10-11 miles west and a little north of Cheyenne. The South Crow Creek is a tributary of Middle Crow Creek, joining the latter about two miles west of Silver Crown. Brush Creek is a tributary of North Crow Creek, joining it from about one and one-half to two miles west of the points of diversion of plaintiff. The latter, so far as appears from the record, is interested only in the diversion of water by the city above its points of diversion on North Crow Creek and Brush Creek. But since the principles of law would be the same as to other diversions made by the city, and these are deemed by counsel for plain-

tiff to be of some importance, we shall refer to them all. The amount of water running in these streams varies. According to the testimony of the witness Whiting there was a current in all of these streams in June, 1933, of about 9.85 cubic feet of water per second of time per day, and a flow of 1.78 cubic feet per second of time per day on North Crow Creek and Brush Creek, above plaintiff's diversion points. So that from that time or a little earlier, the City of Cheyenne, fearful that the water-shortage then existing, despite various reservoirs built by it, would become greater and greater, too, about June, 1933, all the water in Crow Creek and its tributaries, and restricted the use of water for lawns in the city to as low as two hours a week. It took other steps to conserve water; further, deeming the situation desperate, even established water-pumping plants at Silver Crown and Ware—the latter closer to Cheyenne than the former, and both located on Main Crow Creek. In this situation, the city caused the headgates at plaintiff's diversion points to be closed along with others. It would seem that about that time the city, for various purposes, used about 6,500,000 gallons per day, equivalent to about ten cubic feet per second of time.

The plaintiff takes its water from North Crow Creek through the Whitney ditch and the North Crow ditch. Its water rights were acquired through predecessors. The rights along Crow Creek, including that of plaintiff and the defendant, were adjudicated finally by a decree of the District Court of Laramie County on April 18, 1888. This decree is referred to at length and was upheld in the case of Holt v. City of Cheyenne, 22 Wyo. 212, 137 Pac. 876. The plaintiff's predecessors were awarded 4.25 and 6.25 cubic feet of water respectively. The City of Cheyenne was awarded 12,481 cubic feet, a much larger amount than the stream ever carried. In fact doubt was expressed at

the time that the whole North Crow watershed furnishes sufficient water for the needs of the city, which perhaps includes Fort Francis E. Warren, though the details are not shown. In paragraph 16 of the decree, the court decreed a prior right in the City of Cheyenne against all other appropriators in the following language:

"The Court finds that the City of Cheyenne as against each, every and all appropriators of water from the Main Crow Creek and its tributaries and as against all other persons is entitled by priority of right for the use of its inhabitants to twelve-thousand and four-hundred and eighty-one cubic feet of water per second of time of the waters of Crow Creek and the Court finds that the said City of Cheyenne is entitled to an injunction against each and every appropriator of water from Crow Creek or any of its tributaries enjoining him and them to permit sufficient water to flow down to the City ditch and City of Cheyenne pipe line to satisfy the said prior right of the said City and enjoining him and them from diverting water from said Crow Creek or either of its tributaries, in such a manner or to such an extent as will in any wise interfere with the said prior right of the said City of Cheyenne.

At the time of this decree, though nothing is mentioned therein as to the outlets used, the city took its water from a ditch with a carrying capacity of 9 cubic feet of water per second of time, and a water pipe carrying 3.48 cubic feet. The ditch was abandoned and has not been used since about 1927, so that the plaintiff asserts that, as against it, the city's priority of right is limited to the carrying capacity of this pipe line, to-wit, to 3.48 cubic feet per second of time. Subsequent to the decree above mentioned, the city filed with the state engineer certain applications, headed, except in the case of reservoirs: "Application for a permit to divert and appropriate the water of the State of Wyoming." In them are given the name of the applicant,

its post-office address, the use to which the water is to be applied, the name of the ditch or canal through which the water is to be carried, the source of the proposed appropriation, the headgate of the proposed ditch or canal, the size of the ditch or canal, the dimensions and size of the proposed work, the cost thereof, the use to be made of the water, the time when the work was proposed to be commenced and ended. The applications for the construction of the reservoirs are headed: "Application for a permit to construct a reservoir and to store the unappropriated water of the State of Wyoming." Subsequent to the filing of the applications above mentioned, there were executed what are called "proof of appropriation of water," and certain facts are stated therein, none referring in any way to the original appropriation mentioned in the decree of 1888. The papers were also marked, presumably by the State Engineer, with a proper number of priority, all much later than 1888. Later still, certificates of appropriation were issued by the Board of Control of the state, reciting the presentation of proof, and adjudging that the board had on a certain date determined and established the priority and amount of the appropriation (stating it) as of a certain date, referring to the date of the application. The applications were for the following:

1. Enlargement of the city ditch to 12.48 c. ft., dated September 1, 1895.

2. Pipe line from Middle Crow Creek about 28 miles westerly from Cheyenne, for 9.5 c. ft., dated May 27, 1909.

3. Pipe line from North Crow Creek, a little above joinder of Brush Creek with it, and from 1 to 2 miles above plaintiff's point of diversion, for 12.5 c. ft., dated May 16, 1910.

4. Pipe line from South Crow Creek for 7 c. ft., dated September 26, 1910.

5. Brush Creek pipe line for 3.10 c. ft., dated January, 1911.

6. Construction of Granite Springs reservoir, about 25 miles westerly from Cheyenne on Middle Crow Creek, capacity 7376 acre feet, dated November 9, 1901.

7. Construction of Crystal Lake reservoir, a little over 20 miles from Cheyenne, and a little east from Granite Springs reservoir, for 3618 acre feet, dated January, 1921.

8. Enlargment later for 894 acre feet, January, 1921.

9. Upper Van Tassel reservoir on North Crow Creek, above the pipe line, for 2735 acre feet. Application in 1912, not yet adjudicated.

The various pipe lines join about 2½ miles west of Silver Crown, and a pipe line then leads to what is called the Round Top reservoir and filter bed, which is used mainly for sedimentation and purification, and the water from which then flows to the city and Fort Francis E. Warren.

The city, admitting the adjudications with the priorities fixed by the board of control, pleaded and contends that it constructed the various pipe line and reservoirs for the purpose of making available to it the water adjudicated to it by the decree of 1888. The judgment herein is against plaintiff, from which it has appealed.

Plaintiff, in order to recover herein, claims that the city's prior water right of 12,481 cubic feet of water has been cut down to 3.48 cubic feet. The main contentions of its counsel may be summed up as follows:

(1) The city could not have a valid appropriation except to the extent of its diversion works at the time of the decree of April, 1888, namely, 12.48 cubic feet of water per second of time, and could not enlarge this right to the prejudice of an appropriator with an inferior right. (2) The city, in 1927, abandoned, by non-user, even the greater amount of this 12.48 cubic feet, namely, the water conducted through the old city ditch, in an amount of 9 cubic feet of water per second of time, and consequently its right was cut down to the amount which was carried by the old water pipe in 1888, namely, 3.48 cubic feet of water. (3) That whatever other right the city has, it acquired by reason of new appropriations made subsequent to 1888, and therefore much inferior to the right of plaintiff; that the city cannot claim that these appropriations relate back to its original priority, but is bound by the priorities given to the adjudications thereunder, since the board of control has jurisdiction to adjudicate priorities, and that changing the points of diversion could not be made to plaintiff's prejudice. Many cases are cited which are thought to sustain these points, and plaintiff contends that there is no difference between an appropriation made by a city and those made by an individual, although the contrary was held in Holt v. City of Cheyenne, supra.

Passing, for the time being, the first contention, and assuming it to be correct for the moment, let us take up the second—the abandonment by non-user of the nine cubic feet of water formerly carried in the city ditch. No other non-user is claimed. Counsel for the city contend that in order to find that this water was abandoned, an intent to abandon must be shown, and that this has not been done in this case. We agree that no such intent has been shown, and that it is necessary to be shown in the ordinary case, in order to prove abandonment. 67 C. J. 1048. But in many of the states,

including our own, a statute of non-user, or forfeiture (which, however, is strictly construed: Kinney, Irr., (2d Ed.) Sec. 1120), has been enacted, in which case it is generally, though not universally, held that the element of intent is not necessary. The point was raised in Hereford Ranch v. Hammond Packing Co., 33 Wyo. 14, 236 Pac. 764, but was not decided. We think that we need not decide the point here. Counsel for plaintiff rely upon this statutory rule of non-user, which, it is claimed, is at least prima facie evidence of abandonment. They cite section 122-421, Rev. St. 1931, which in part reads as follows:

"In case the owner or owners of any such ditch, canal or reservoir shall fail to use the water therefrom for irrigation or other beneficial purpose during any five successive years, they shall be considered as having abandoned the same and shall forfeit all water right, easements and privileges appurtenant thereto."

The statue, by its terms, deals with limitations and restrictions of the use of water. And notwithstanding the peculiar use of terms, it must, we think, be accepted that it is, primarily, aimed at the non-user of water, and not to the non-user of any particular ditch, canal or reservoir, for, as stated in Hereford Ranch v. Packing Co., supra, it is a fundamental principle under the irrigation law that all the available water supply should be used as far as that is possible. That is the construction placed on similar statutes dealing with the supject of non-user in other states. Weil, Water Rights, (3rd Ed.) Sections 574-578; Kinney, on Irrigation, (2nd Ed.) Sections 1188-1220. Nor is any other construction contended for. The particular place from which the water is taken is, accordingly, of no importance in this connection. And if the water is actually used by change of the point of diversion, there is no non-user of the water. Kinney, supra, Sec. 1107-1108. In fact it has been held that even a change of diversion

not in compliance with a statute will prevent the application of the rule of non-user. 67 C. J. 1050. And such change was made, we think, in the case at bar. See the Holt case, supra. Our statutes do not forbid a change of points of diversion. The right to make it has been said to be a property right. 67 C. J. 1031. In Groo v. Sights, 22 Wyo. 19, 134 Pac. 269, it was contended that no change of the point of diversion could be made. No contention was made in that case that it was not permitted under Section 122-421. The only statute referred to was Sec. 122-401, providing among other things that "water rights cannot be detached from the lands, place or purpose for which they are acquired, without loss of priority." The court, speaking of the right to change, said:

"To allow such a change, when others will not be injuriously affected thereby, is not only manifestly just, but before the enactment of that statute (122-401) it was held by this court that the place of diversion may be changed if it can be accomplished without injury to others, following the well-settled rule on the subject. (Johnston v. Little Horse Creek Irr. Co., 13 Wyo. 208, 79 Pac. 22; 70 L. R. A. 341; 110 Am. St. Rep. 986.) It would seem, therefore, that a legislative intention to change the rule thus styled, should be clearly expressed."

The rules as to whether a change can be made to the prejudice of others are not fixed. It is said in 67 C. J. 102:

"While there is no fixed rule for determining whether a change in point of diversion will injure others, and each case depends largely on its own surrounding circumstances and conditions, there can generally be no change in point of diversion which will result in an enlarged use either as to amount or time."

One of the main criteria, accordingly, seems to be as to whether or not the change will result in an enlarged use either as to the amount or time. It is difficult to see

how an appropriator, entitled to use all of the water of a stream in case of need, may be said, from whatever place he takes the water, to make an enlarged use thereof when he merely takes that to which he is entitled in case of necessity.

However, the exact point here involved has been decided. Holt v. City of Cheyenne, supra, a case like this. In that case, as here, the point of diversion to part of the water was changed to a point above the diversion point of the party holding an inferior right. The points of diversion in question were those at Granite Springs reservoir and Crystal Lake reservoir and the pipe line connecting therewith. There it was alleged "that the taking of the water from said creek in so far as the change from the original point of diversion below to a place above plaintiff's land was a flagrant violation of plaintiff's right, as by doing so all the water was impounded, taken into conduits or pipe lines and conducted down by plaintiff's premises, thus depriving him of his water supply for irrigation," to plaintiff's injury and damage. The court stated:

"Taking these allegations as true, it is apparent that the respective rights of the parties must be measured by the decree of April, 1888. * * * The change of headgate from its original place is a right which has been recognized by this court, provided such change does not injure other appropriators from the same source of supply. * * * At the time of the adjudication here complained of, the city was not limited by law to the appropriation of only the amount of water required or necessary for the inhabitants of the city, but might appropriate and acquire more than sufficient for those purposes as they then existed, and this was done. If the right to change the point of diversion was denied, such appropriation might be insufficient for the city as its needs and wants in that respect augmented by increased population."

This court, then, has distinctly decided that the city has the right to change its points of diversion under

facts almost exactly like those in the case at bar, and inasmuch as the pipe lines constructed supposedly carry more than the 9 c. ft. originally taken out of the city ditch, it is clear that there was no non-user as claimed. We may, moreover, say at this place that if the rights of the parties were to be measured by the decree of 1888, then that must be true now, since no material changes within the meaning of the foregoing decision, other than the abandonment of the old ditch, have been made since that time.

That leads us to the third contention. It is argued that no change of the point of diversion is involved herein; that, on the contrary, the diversions at the various pipe lines and reservoirs of the city were under new appropriations of water with priorities inferior to that of plaintiff. Counsel call those changes the junior appropriations of the city. It can, however, hardly be denied that these changes *may* be considered as changes in the point of diversion. And they were so treated by all the counsel and the court in Holt v. City of Cheyenne, supra. One of the counsel for Holt was a former chief justice of this court, and an able lawyer, yet he lacked either the ingenuity or courage to advance the claim made by counsel for plaintiff in this case. If we hold that the assignment of priority by the board of control is decisive, it would naturally include the further holding that the original priority was abandoned, though no intent to abandon has been shown. The point was at least to some extent under consideration in the Holt case, as shown by the briefs and the decision in that case, and the court at least impliedly held that none of the city's water had been abandoned. It has been held that posting up a new notice does not of itself show abandonment. Norman v. Corbley, 32 Mont. 195, 79 Pac. 1059; 1 Weil, Water Rights (3rd Ed.) p. 426: In Re Water Rights, 134 Ore. 623, 286 Pac. 563, 571. And in Pioneer Irr. Dist. v.

American Ditch Ass'n., 50 Idaho 732. 1 P. (2d) 196, it was held that an application filed with the state engineer, which ripened into a license, did not deprive an appropriator of the priority, given by a court, previously acquired. See also In Re Water Rights, 115 Ore. 27, 237 Pac. 322, 329, and numerous cases cited. To the ordinary man, the construction of the reservoirs and pipe lines would suggest merely an extension of the city's water system, not an abandonment of any prior right. A belief to the contrary would, in the absence of clear evidence to the contrary, be wholly unreasonable, and a technical mistake, if made, ought not to control the case. The applications themselves do not indicate that the city intended to abandon its prior rights. They were made on blanks used for new appropriators, and we all know that blanks which are on hand are apt to be used, when in fact inappropriate to the particular case in hand. Hence the title of the blanks should not be considered of any importance herein. The applications for the construction of reservoirs may be explained by the fact that the legislature forbade the construction of any dams above 10 feet high unless approved by the State Engineer. Sec. 122-1401, Rev. St. 1931; Sess. Laws 1886, Ch. 61, Sec. 25. The adjudications state, it is true, a subsequent priority of right, and it is further true that the board of control has jurisdiction to adjudicate priorities. In this case there was no adjudication, or attempted adjudication, of priorities between the various appropriators on Crow Creek; the adjudications made do not refer to or cancel the original priority of the city, and it is at least doubtful, when the city had the lawful right to change its points of diversion, how the board of control, an inferior tribunal could cancel the city's prior rights given by a higher tribunal, unless, perchance, done with the city's consent, which does not appear, or a proceeding for abandonment of the prior right had

been instituted and adjudicated, which also does not appear. Nor would such proceeding be valid without review in court. § 122-427, R. S. 1931. In all human probability, as already stated, the city had in mind simply the extension of its water works. Cheyenne was a growing city, in a new state, bound to develop. It spent nearly $1,500,000 on the construction of additional pipe lines and on reservoirs, aside from the construction at Round Top, used mainly as a purification plant. Now the decree of April, 1888, allotted to various owners, outside of that allotted to the city, 481. 95 cubic feet of water per second of time, an amount vastly greater than that carried in the total Crow Creek watershed, making all appropriations subsequent to 1888 apparently worthless. And to maintain that the city, by asking for diversions at various points, meant to and in fact did ask new appropriations, leaving them no water at all, except 3.48 cubic feet, and sink the large amounts of money above mentioned into projects apparently absolutely worthless, would carry us far into the field of credulity. The city, under these circumstances, cannot, we think, be held to have abandoned any of its priority; it had the right to change the points of diversion, if not injurious to others; it was not compelled to ask the state engineer whether to do so or not; it could do so without reference to him, and the adjudications made should, accordingly, we think, be held to be without effect, in so far as they seemingly attempt to divest the city of any right of priority. To hold otherwise would be to disregard substance, and give an unwarranted effect to form

In view of the facts and the law already discussed, it would seem that without reference to any further contentions of plaintiff, it has not shown any right of recovery herein, or it is at least very doubtful that it has, and it should lay the blame for its injury at the

door of the devasting drouth, and not at the door of the city. There is apparently no claim that the city wasted any water during the drouth. The testimony shows that the city, even under the severe restrictions to the use of water, was using about six and one-half million gallons of water per day, the equivalent of approximately 10 cubic feet of water per second of time. The testimony of Mr. Whiting, if we correctly understand it, is that the flow in the whole water shed of Crow Creek was, during June, 1933, about 9.5 cubic feet of water per day, a situation which, judging from the evidence as a whole, and the fact that the reservoirs were full in 1929, and only one-third full in 1933, existed at the time when plaintiff's headgate was closed, and perhaps up to the time of the trial in this case. This was less than the city was using under severe restrictions. Hence how could it make any possible difference to the plaintiff where the city's headgates were? It would have been compelled to let the water of North Crow Creek run past its place, if the city's point of diversion had not been changed. It could not, accordingly, be damaged when the city constructed some points of diversion above its place, which was beneficial to it, but harmless to plaintiff. And this was the conclusion, under similar facts, though not discussed in the manner in which we have done so, arrived at in the case of Holt v. City of Cheyenne, supra. In fact that case and the Edwards case (Edwards v. City of Cheyenne, 19 Wyo. 110, 169, 114 Pac. 677, 122 Pac. 900) have, by what is said therein, and by what must necessarily be implied from what is said, substantially dispose of every contention made in this case, although counsel for plaintiff are not willing to admit the broad scope of these decisions, and generally consider them, as we think, altogether too narrowly.

We pass, however, to make this decision clearer, to the first contention above mentioned. It is claimed that

the amount of appropriation of the city could not exceed the carrying capacity existing at the time of the decree in 1888. This seems to be supported by some authorities, although under facts entirely different from those existing here. See McDonald v. Lannen, 19 Mont. 78, 47 Pac. 648. The contention is made in a way to furnish the premise for the further contention that no appropriation of a senior appropriator can be enlarged as against one with an inferior right. We are not called upon to dispute the latter claim, and may admit it to be correct. But the senior appropriation in this case consisted of 12,481 cubic feet of water per second of time, as decided by the decree of 1888 and in Holt v. City of Cheyenne, supra. It is that right which could not be changed to the detriment of those holding junior rights. The trouble and vice of counsel's argument is that they are not willing to start with this premise, but start from the premise above mentioned, namely, that the city, by lack of carrying capacity, never had a right to any water except to the extent of 12.48 cubic feet. In effect counsel say that while the decree of April, 1888, gave the city a priority of 12,481 cubic feet, the right thereto was lost the very moment in which it was given. It is clear that this cannot be accepted as reasonable, and no cases have been cited by counsel to support such contention. We may here call to our partial aid the doctrine of relation back. Long on Irrigation, Sec. 126; 67 C. J. 981; Weil, Water Rights, Sec. 393; Kinney, Irrigation, Sec. 742. For the history relating to appropriation, see Weil, supra, sections 139, 473-479. Limitation to capacity of ditch seems to have been the general rule, when appropriation commenced for mining purposes. Possession was then the main criterion. But when the principles of appropriation were extended to irrigation, a different rule grew up, since it was frequently impracticable for a land owner to construct his diversion works, and

therefore make beneficial use of the water, all at once. No appropriator can, of course, use more water than the outlet from a stream permits. But that is a different thing from gradually increasing the construction works and thus enlarging the use made of the water intended to be ultimately used. That such enlargment may be made is stated by Weil, supra, Sec. 483, to be the settled rule. He states, speaking of an appropriation for future use:

"The amount used need not be a fixed, constant quantity. The amount used is still a limit, as previously set forth. But it is a movable limit, which gradually increases as the irrigator's needs increase. The principle has been repeatedly affirmed."

So it is said in In Re Hood River, 114 Ore. 112, 227 Pac. 1065, 1072:

"It would be vain and useless to require an appropriator to construct works necessary to make the entire appropriation of water for all the land intended to be irrigated at the inception of the project, when it is not in readiness to receive the same, and there is no immediate purpose for which the water can be used. The law does not require nor compel settlers to cultivate all their land within a short time or to be deprived of the benefit of a large portion of the water right which has been properly initiated for the purpose of irrigating their irrigable lands."

Kinney on Irrigation, Sec. 740. states:

"The law does not require impossibilities of the appropriator; neither does it require him to do vain or useless things. Therefore it was unnecessary for the settler in our illustration to entirely construct during the first year all of his works necessary for him to make the entire appropriation of the water for all of the land; it was also unnecessary for him during that year to apply the entire amount of the water claimed under the full appropriation."

And in Section 741, the same author says:

"The full enjoyment of the water attempted to be appropriated does not, of course, commence until the works are finally completed and capable of conducting all of the water; but against all others, subsequently attempting an appropriation of the waters of the same stream, the right of the first appropriator to the use of the water dates or relates back, by what is known as the doctrine of relation."

See also 67 C. J. 1010-11, 1022, and In Re Water Rights, 129 Wash. 9, 224 Pac. 29; Kinney, supra, Sec. 886.

We do not think that any of the decisions of this state is contrary to the authorities here cited. Weil, supra, Sec. 483, states that "the same doctrine has been applied to future enlargment of use for power purposes as well as irrigation." In view of these facts, we cannot see why an analogous doctrine should not apply to municipal purposes, and indeed more so. The authorities require, it is true, a reasonable time, in which the diversion works and the application to beneficial use shall be completed. Kinney, Irrigation, Vol. 2, Sec. 781, page 1359; Weil, supra, Sec. 484. The latter author, however, speaking of the quantity appropriated, states in Section 476:

"Now the great weight of authority disregards capacity of ditch entirely, without regard to any length of time in which it remained out of use and without regard to any intention not to abandon it. Actual use *within a reasonable time prior to the time a controversy arises* is alone the test stated today in the decisions generally." (Italics are ours.)

And in Sec. 481 he states that "the tendency of decisions today is to figure beneficial use solely at the very time when any controversy arises." Applied to the case at bar, this seems to mean that what water right the city had, depended upon what it had used within a reasonable time prior to the time when this

action herein was instituted, in which case, the plaintiff herein would have no reason to complain, since the city, by aid of its reservoirs, used more than was available during the drouth. This, however, in some cases at least, would seem to be somewhat inconsistent with the rule that the application to beneficial use must be made within a reasonable time. In this case, we do not think there is any inconsistency. What is a reasonable time is a question of fact. Weil, supra, Sec. 480. In Hall v. Blackman, 8 Idaho 272, 68 Pac. 19, a period of 14 years was held not to be too long, in the case of irrigations. See Kinney on Irrigation, Vol. 2, Sec. 738. If that is so, then the period taken by this city, which completed its present water system, at least, in 1921, and most of it before that, cannot be held to be too long, in view of the fact that it was a constantly growing city, and especially in view of the decision in Holt v. City of Cheyenne, supra. We may say in that connection that it was confidently asserted by counsel for plaintiff in the case of Holt v. City of Cheyenne that the city would never have a population of more than fifteen thousand. The facts in this case seem but to verify other facts showing that true prophets no longer traverse our land.

In the decree of April, 1888, the court allotted to the City of Cheyenne 12,481 cubic feet of water per second of time, and gave it a priority over all others taking water from the stream. That decree was upheld as in full force in the Holt case. See also May v. Penton, 45 Wyo. 82, 16 P. (2d) 35. The rights granted by a solemn decree of the court are surely of higher standing than the rights acquired under the ordinary method of appropriation under the doctrine of relation back, and if under that doctrine the ultimate amount sought to be appropriated is not limited to the first needs, but may be enlarged from time to time, surely, no less could be conceded to the municipality to the extent of its adjudi-

cated appropriation. To say that the city received a definite right, but that such right was at the same moment lost, by extraneous circumstances, is not, as already stated, reasonable, if for no other reason than that all things necessary for the grant of the right must be held to have been adjudicated. 34 C. J. 923, 927. It cannot, accordingly, be surprising that this court in analogy to the doctrine of relation back, stated in the Holt case that the city was not limited in the amount of its appropriation to the needs of its citizens at the time of the adjudication, and that in the Edwards case it stated that the "city may have an abundant supply of water with inadequate or inconvenient means of distributing the same," and that it may lawfully extend its system of water works, and among other things provide reservoir facilities for the purpose of increasing the water supply. In the Holt case, decided in 1913, it was further stated that, in a case like that at bar, the rights of the parties must be measured by the decree of 1888. That necessarily excludes the contention of plaintiff that these rights are to be measured by a one-hundredth part of the right granted by the decree. The decision in that case, accordingly, disposes of the contention and premise of plaintiff above mentioned.

It is claimed that the construction of reservoirs was unlawful as against plaintiff, although it is well known that a city must, for its safety, have on hand at all times an extra supply which may be drawn on in case of emergency. The point urged was decided adversely to plaintiff in the Holt case, which involved the Granite Springs and Crystal Lake reservoirs. We might add that the argument that this state recognizes two different rights, one for appropriation of water directly from the stream, and one for appropriation from reservoirs, seems to have been true only since 1903. Ch. 69, Laws of 1903. The Granite Springs reservoir was con-

structed, or at least commenced, two years prior to that time. The decree of April, 1888, recognizes no such distinction, and the right to construct reservoirs has been recognized by the legislature at least since 1886. Sec. 1355, Rev. St. 1887. It is doubtless true, just as in the case of a change in the point of diversion, that an appropriator cannot construct a reservoir, if he thereby injures another appropriator. But what constitutes an injury in this case? If, as has been decided, the city is entitled, in case of need, to all the waters of the Crow Creek watershed, it must, impliedly, have the right, in order to enjoy it, to take such means, in case of need, as is appropriate for that purpose. Moreover, the present laws in regard to permits for storage relate only to unappropriated waters; the city in this case merely impounded water already adjudicated in its favor. Kinney, supra, Section 704, states that not only may a valid appropriation be made for immediate use, but that the water may be saved up and stored in times of plenty and thus saved for the ultimate purpose of using the same in times of scarcity. See also Long, Irrigation (2d Ed.) Sec. 276. The rains in this region are exceedingly irregular. And if the rule stated by Kinney is correct when applied to an original appropriation, it is surely correct as to water already adjudicated. The argument that stored water is not used for a beneficial purpose cannot be accepted as correct in this case. It, aside from other uses, stands as a partial protection against the spread of fire in the city every minute of the day, and therefore, at all times subserves a most beneficial purpose. Here is one of the differences between an appropriation for irrigation and one for municipal uses.

The only other important point argued is that relating to surplus. The use of water at Fort Francis E. Warren is stated by counsel at one place not to be in the case, but objection to such use is made at other

places. In this connection we leave out of consideration the fact that the Fort was established as early as 1867; that it necessarily used, for its needs, the waters of Crow Creek, and whether, as against the government of the United States, anyone, including the state, had any right to divest it of its water right acquired by it either as a riparian owner or as an appropriator by actual use. In any event, the matter of surplus arises mainly by reason of the use of water at the Fort; the general subject is vigorously discussed, and we shall do so to some extent. As a general proposition, this point is, perhaps, the most troublesome in the case, for it may be that if Fort Francis E. Warren had not used any of the waters of Crow Creek, plaintiff, though the city used less by reason of its restriction than it was entitled to, might have had at least some water. That fact does not, however, appear from the evidence in the case, and we confine ourselves to the general proposition. It was held in Johnston v. Little Horse Creek, 13 Wyo. 208, 79 Pac. 22, that an appropriator does not own surplus of water and cannot, accordingly, dispose of it. And that seems to be the general rule. 2 Kinney, supra, p. 1368, 1837. In the Holt and Edwards cases, on the contrary, the court held that a disposal of part of its water by the city to Fort Francis E. Warren was legal. It is apparent that the statements in our own cases seemingly are in conflict. They may be largely reconciled, however, by the fact that the earlier case dealt with irrigation, while the later cases dealt with water used by a municipality, and we are not prepared to say that such distinction is not, in some respects at least, a valid one, especially where the municipality is a growing one. Counsel for plaintiff construe the Holt case to mean merely that the city had the right to sell the lawfully stored water in the reservoirs. We are unable to see how such construction is possible. The case involved a diversion by, and construction of,

reservoirs and pipelines under almost the exact situation presented in this case, and the very question of lawfulness was in controversy. The court said in part:

"The right to the use of the water by the city having accrued in the amount of and as fixed by the decree (of April, 1888), the city had the right to dispose of and apply its surplus water to a beneficial use up to the amount of its appropriation, even though by doing it, it left no water in the creek for subsequent appropriators."

It must be borne in mind that the court in the Holt and Edwards cases was required to consider not only the general laws and rules relating to appropriation of water, but several other rules of law as well. In the first place it was called on to consider the decree of April, 1888, which is ordinarily res judicata as to all parties to the action in regard to all matters directly decided, and which were necessarily decided as a basis of the judgment; second, the power granted by law to the City of Cheyenne, and third, the general rules of what we may call the common law rules relating to municipalities. All these were required to be construed together, and the court concluded, seemingly, that the strict rules relating to irrigation cases as applied in some cases could not fully be applied to a municipality under the circumstances presented. At this time there must further be taken into consideration Section 2, Ch. 40, Session Laws of 1911, in which the specific contract of the city to furnish water to Fort Francis E. Warren was approved. We need not, so far as the point under consideration is concerned, put too strict a construction on the Holt or Edwards cases, or on the decree of 1888, as construed in those cases. Take the latter, for instance. It awarded the water right to the city for the use of its "inhabitants." The term "inhabitant" implies a permanent abode. Webster's New International Dictionary, second edition. If we give a

strict construction to the decree, we would be required to hold that the city cannot lawfully, as against those who have an inferior right, furnish water to transients. Such construction would not conform to a rule of reason. And so, perhaps, light on the subject before us, and on what was said thereon in the Holt and Edwards cases, may be had by inquiring as to what may be included in the term "municipal use"—for that the 12,481 cubic feet of water per second of time were allotted to the city for that purpose cannot be questioned. The term "irrigation of lands" is easily understood and unequivocal. The term "municipal use," may be construed broadly or narrowly. The City of Cheyenne, for instance, has little, if any, jurisdiction over the Federal grounds and buildings situated thereon. Would it be contended, merely for want of that jurisdiction, that the city has no right to furnish any water to these grounds, or to the people laboring in the buildings? And what would be the situation, if Fort Francis E. Warren occupied a number of blocks in the city limits, or these limits should be extended in the course of time so as to totally surround the grounds now occupied by the Fort? Section 2, Ch. 40, Session Laws 1911, ratifies the contract of the city to supply water to the Fort. The legislature, not presumed to do a foolish act, doubtless had in mind the water right decreed by the decree of April, 1888, and not what counsel for plaintiff call junior rights under new appropriations, the worthlessness of which we have already mentioned. The effect of the enactment was, or the fair inference may be drawn therefrom, that the legislature meant to declare that the use of water furnished to the Fort should come within the meaning of municipal use—for the city procured the appropriation mentioned only for that purpose. So, in view of what has been said, the Holt and Edwards cases, apparently broad and sweeping in their scope as they are, may well or should be

construed as relating, on the point under consideration, only to places closely adjacent to the city, which, while not legally, may, for many practical standpoints, so far as municipal use of water is concerned, be considered as parts of the city. This view would to some extent at least harmonize what we have above called the rules of common law, and the rules of appropriation of water, in so far as the point under consideration is concerned. It may be added, that appropriations are frequently made, in some of the states, by corporations and associations, as trustees for future water users who, at the time of the appropriation, are unknown. See e. g. Hagerman Irr. Co. v. McMurry, 16 N. M. 172, 113 Pac. 223.

However the foregoing may be, the Holt and Edwards cases furnish not only the ordinary precedent, which would, in any event, be generally followed, but they go further, and establish, we think, a rule of property, at least in regard to the appropriations of water from Crow Creek and its tributaries. It was held, for instance, that decisions defining the rights of riparian proprietors are a rule of property and will not be overruled. Miller v. Canal etc. Co., 169 Cal. 415, 147 Pac. 567. Some of the rules established in the Edwards case, and the rules laid down in the Holt case, relate to each and every claimant of a water right in the Crow Creek watershed west of the City of Cheyenne. And it is well known that decisions making a rule of property will not be overruled except under the gravest circumstances. 15 C. J. 947-949. So we think that we would not be warranted in overruling the Holt case and the Edwards case, interpreted as above mentioned. They were rendered more than twenty years ago, and the city has expended a considerable amount of money in reliance thereon. If they had been adverse to the city, it is not improbable that it could have

exercised the power of eminent domain (Const., Art. 13, Sec. 5), condemning prior rights in times of plenty of water, and at a sum reasonable in amount, but possibly prohibitive in times of scarcity. If, then, our predecessors erred in the decisions mentioned, nevertheless it behooves us, their successors, at least under the circumstances here, not to make claim to wisdom greater than theirs and to act with a modesty suitable to their worth.

From what we have said, it appears that the city had the right to take the water of plaintiff at the times mentioned. It consequently sustained no damages by reason of that fact, and without discussing other, unnecessary matters, it follows that the judgment below should be affirmed. It is so ordered.

*Affirmed.*