Justice Thomas
delivered the opinion of the Court.
This case arises out of a dispute between Montana and Wyoming over the Yellowstone River Compact (or Compact). Montana alleges that Wyoming has breached Article V(A) of the. Compact by allowing its pre-1950 water appropriators to increase their net water consumption by improving the efficiency of their irrigation systems. The new systems, Montana alleges, employ sprinklers that reduce the amount of wastewater returned to the river, thus depriving Montana’s downstream pre-1950 appropriators of water to which they are entitled. The Special Master has filed a First Interim Report determining, as relevant here, that Montana’s allegation fails to state a claim because more efficient irrigation systems are permissible under the Compact so long as the conserved water is used to irrigate the same acreage watered in 1950. We agree with the Special Master and overrule Montana’s exception to that conclusion.
I
From its headwaters in Wyoming, the Yellowstone River flows nearly 700 miles northeast into Montana and then North Dakota, where it joins the Missouri River. Several of its tributaries, including the Clarks Fork, Tongue, Powder, and Bighorn Rivers, also begin in Wyoming and cross into Montana before joining the main stem of the Yellowstone *372 River. This river system’s monthly and annual flows, which are dictated largely by snow melt, vary widely. In 1964, for example, the flow in the Tongue and Powder Rivers was nearly 10 times the 1961 flow. App. 936. As the rivers came into heavy use for irrigation, it became expedient to build water storage facilities for preserving the heaviest flows. See First Interim Report of Special Master 6 (hereinafter Report).
Before funding new water storage facilities, Congress sought agreement as to the allocation of the Yellowstone River system among Wyoming, Montana, and North Dakota. In 1932, Congress granted the States permission to negotiate a compact. See Act of June 14, 1932, ch. 253, 47 Stat. 306. Draft compacts were produced in 1935, 1942, and 1944, but none was fully agreed upon. Finally, in 1951 Montana, Wyoming, and North Dakota ratified the Yellowstone River Compact, and Congress consented to it. Act of Oct. 30, 1951, 65 Stat. 663.
The Yellowstone River Compact divides water into three tiers of priority. First, Article V(A) provides: “Appropriative rights to the beneficial uses of the water of the Yellowstone River System existing in each signatory State as of January 1, 1950, shall continue to be enjoyed in accordance with the laws governing the acquisition and use of water under the doctrine of appropriation.” Id., at 666. Second, Article V(B) allocates to each State the “quantity of that water as shall be necessary to provide supplemental water supplies” for the pre-1950 uses protected by Article V(A). Ibid. Third, “the remainder of the unused and unappropriated water” of each tributary is divided by percentage: Wyoming receives 60% of the remaining water in the Clarks Fork River, 80% in the Bighorn River, 40% in the Tongue River, and 42% in the Powder River; the rest goes to Montana. Id., at 666-667.
In February 2008, we granted Montana leave to file a bill of complaint against Wyoming for breach of the Com *373 pact. 552 U. S. 1175. Montana alleged that Wyoming had breached the Compact by consuming more than its share of the Tongue and Powder Rivers. Bill of Complaint 3, ¶8. Specifically, Montana claimed that Wyoming was appropriating water for a number of new, post-1950 uses: irrigating new acreage; building new storage facilities; conducting new groundwater pumping; and increasing consumption on existing agricultural acreage.[1] Id., at 3-4, ¶¶ 9-12. According to Montana’s complaint, the Compact did not permit Wyoming to use water for any of these practices as long as Montana’s pre-1950 users’ rights remained unfulfilled. Id., at 3, ¶ 8.
In response, Wyoming filed a motion to dismiss the complaint. We appointed a Special Master and referred the motion to him. 555 U. S. 968 (2008). After briefing and argument, the Special Master recommended that we deny Wyoming’s motion, because at least some of Montana’s allegations state a claim for relief. The Special Master found that “Article V of the Compact protects pre-1950 appropriations in Montana from new surface and groundwater diversions in Wyoming, whether for direct use or for storage, that prevent adequate water from reaching Montana to satisfy those pre-1950 appropriations.” Report 14-15. But the Special Master agreed with Wyoming that Montana’s allegations regarding “efficiency improvements by pre-1950 appropriators in Wyoming” do not state a claim for relief. Id., at 15. The States did not object to most of the Special Master’s findings, and we have issued orders accordingly. *374 See 562 U. S. 958 and 979 (2010). Montana has filed an exception to the Special Master’s rejection of its increasedefficieney allegation. It is this exception that is before us.[2]
II
Article V(A) of the Compact states that “[ajppropriative rights to the beneficial uses of [water] . . . existing in each signatory State as of January 1, 1950, shall continue to be enjoyed in accordance with the laws governing the acquisition and use of water under the doctrine of appropriation.” Montana claims that its pre-1950 appropriators’ rights are not “continuing] to be enjoyed” because upstream pre-1950 appropriators in Wyoming have increased their consumption by switching from flood to sprinkler irrigation. Montana alleges that sprinkler systems increase crop consumption of water and decrease the volume of runoff and seepage that returns to the Tongue and Powder rivers by 25% or more.[3] See Montana’s Exception and Brief 3 (hereinafter Brief for Montana). As a result, even if Wyoming’s pre-1950 water users divert the same quantity of water as before, less water reaches Montana. According to Montana, Article V(A) prohibits Wyoming from allowing this practice when it deprives Montana’s pre-1950 users of their full water rights.
The question, therefore, is whether Article V(A) allows Wyoming’s pre-1950 water users — diverting the same quantity of water for the same irrigation purpose and acreage as before 1950 — to increase their consumption of water by *375 improving their irrigation systems even if it reduces the flow of water to Montana’s pre-1950 users. Montana makes two basic arguments: that background principles of appropriation law, to the extent they are incorporated into the Compact, do not allow such an increase in consumption; and that even if they do, the terms of the Compact amended those principles in Montana’s favor. The Special Master rejected these arguments, and so do we.
A
Because Article V(A) of the Compact protects “[a]ppropriative rights to the beneficial uses of [water]” as of 1950 “in accordance with the laws governing the acquisition and use of water under the doctrine of appropriation,” we begin with an overview of appropriation doctrine.[4] As the Special Master explained, if “[appropriation law clearly proscribe[s] increases in consumption on existing acreage to the detriment of downstream appropriators, the Compact arguably would prohibit Wyoming from allowing its appropriators to make such increases to the detriment of Montana’s pre-1950 uses.” Report 65.
As is typical west of the 100th meridian, the doctrine of appropriation has governed water rights in Montana and Wyoming since the 1800’s. See, e. g., Basey v. Gallagher, 20 Wall. 670, 683 (1875). As relevant here, the doctrine provides that rights to water for irrigation are perfected and enforced in order of seniority, starting with the first person *376 to divert water from a natural stream and apply it to a beneficial use (or to begin such a project, if diligently completed). See Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U. S. 92, 98 (1938); Arizona v. California, 298 U. S. 558, 565-566 (1936); Wyo. Const., Art. 8, § 3 (“Priority of appropriation for beneficial uses shall give the better right”). The scope of the right is limited by the concept of “beneficial use.” That concept restricts a farmer “to the amount of water that is necessary to irrigate his land by making a reasonable use of the water.” 1 C. Kinney, Law of Irrigation and Water Rights § 586, pp. 1007-1008 (2d ed. 1912) (hereinafter Kinney) (internal quotation marks omitted); see also Bailey v. Tintinger, 45 Mont. 154, 176-178, 122 P. 575, 583 (1912); Quinn v. John Whitaker Ranch Co., 54 Wyo. 367, 376-380, 92 P. 2d 568, 570-571 (1939). Once such a water right is perfected, it is senior to any later appropriators’ rights and may be fulfilled entirely before those junior appropriators get any water at all.
For our purposes, Montana’s pre-1950 water users are similar to junior appropriators. As between the States, the Compact assigned the same seniority level to all pre-1950 water users in Montana and Wyoming. See Brief for Montana 23; Brief for United States as Amicus Curiae 12. But as Montana concedes, precisely because of this equal seniority, its downstream pre-1950 users cannot stop Wyoming’s upstream pre-1950 users from fully exercising their water rights. Thus, when the rivers are low, Montana’s downstream pre-1950 users might get no water at all because the equally senior users upstream in Wyoming may lawfully consume all of the water. Tr. of Oral Arg. 51.
Junior appropriators are not completely without rights, however. As they come online, appropriators acquire rights to the stream basically as it exists when they find it. See 2 Kinney §803, at 1403-1404. Accordingly, subject to the fulfillment of all senior users’ existing rights, under the no- *377 injury rule junior users can prevent senior users from enlarging their rights to the junior users’ detriment. 1 W. Hutchins, Water Rights Laws in the Nineteen Western States 573 (1971) (hereinafter Hutchins).
Montana’s pre-1950 users can therefore “insist that [Wyoming’s pre-1950 users] confine themselves strictly within the rights which the law gives them, that is, to the amount of water within the extent of their appropriation which they actually apply to some beneficial use.” 2 Kinney §784, at 1366. That general proposition is undisputed; the dispute here is in its application. Is a switch to more efficient irrigation with less return flow within the extent of Wyoming’s pre-1950 users’ existing appropriative rights, or is it an improper enlargement of that right to the detriment of Montana’s pre-1950 water users?
As the Special Master observed, the law of return flows is an unclear area of appropriation doctrine. Report 65 (citing Trelease, Reclamation Water Rights, 32 Rocky Mt. L. Rev. 464, 469 (I960)). The States have not directed us to any case on all fours with this one. Indeed, “[n]o western state court appears to have conclusively answered the question.” Report 65.
Despite the lack of clarity, the Special Master found several reasons to conclude that Wyoming’s pre-1950 users may switch to sprinkler irrigation. He found that the scope of the original appropriative right includes such a change so long as no additional water is diverted from the stream and the conserved water is used on the same acreage for the same agricultural purpose as before. We agree with the Special Master.[5]
*378 1
First, although the no-injury rule prevents appropriators from making certain water-right changes that would harm other appropriators, a change in irrigation methods does not appear to run afoul of that rule in Montana and Wyoming. See id., at 69. Because each new appropriator is entitled to the stream as it exists when he finds it, the general rule is that "if a change in these conditions is made by [a senior] appropriator, which interferes with the flow of the water to the material injury of [the junior appropriator’s] rights, he may justly complain.” 2 Kinney § 803, at 1404.
But the no-injury rule is not absolute; it generally concerns changes in the location of the diversion and the place or purpose of use. Quigley v. McIntosh, 110 Mont. 495, 505, 103 P. 2d 1067, 1072 (1940) (“[P]lace of diversion, or place or purpose of use, may be changed only if others are not thereby injured” (internal quotation marks omitted)); see also 1 S. Wiel, Water Rights in the Western States §498, p. 532 (3d ed. 1911) (hereinafter Wiel); Mont. Rev. Code Ann. §89-803 (1947); Wyo. Stat. Ann. §41-3-104 (1977). Accordingly, certain types of changes can occur even though they may harm downstream appropriators. See D. Getches, *379 Water Law in a Nutshell 175 (4th ed. 2009) (hereinafter Getches). For instance, an appropriator may increase his consumption by changing to a more water-intensive crop so long as he makes no change in acreage irrigated or amount of water diverted. See id., at 183; East Bench Irrig. Co. v. Deseret Irrig. Co., 2 Utah 2d 170, 179, 271 P. 2d 449, 455 (1954) (assuming that farmers may “legally increase the quantity of water consumed in irrigating their lands by changing to more water consuming crops” and adding that “it would be difficult to prevent... such increased consumptive use”). Ordinary, day-to-day operational changes or repairs also do not violate the no-injury rule. See, e.g., 1 Wiel §56, at 51 (“Would the fact that my pump has for years dripped water onto a neighbor’s ground give him a right to say that my pump must go on leaking?”). Consumption can even be increased by adding farm acreage, so long as that was part of the plan from the start, and diligently pursued through the years. See Van Tassel Real Estate & Livestock Co. v. Cheyenne, 49 Wyo. 333, 357-359, 54 P. 2d 906, 913 (1936) (per curiam); 1 Hutchins 377-378; St. Onge v. Blakely, 76 Mont. 1, 22-24, 245 P. 532, 539 (1926).
Improvements to irrigation systems seem to be the sort of changes that fall outside the no-injury rule as it exists in Montana and Wyoming. Those changes are not to the “place of diversion, or place or purpose of use,” Quigley, supra, at 505, 103 P. 2d, at 1072, and thus seem to be excluded, much like crop changes or day-to-day irrigation adjustments or repairs. This is also consistent with the fact that by 1950 both States had statutes regulating certain changes to water rights, but neither required farmers to take official action before adjusting irrigation methods.[6] See Report 69-70,87; id., at 69 (they “do not generally have procedures for over *380 seeing changes in water efficiencies stemming from crop shifts or irrigation improvements where there are no formal changes in the underlying water rights”). Like the Special Master, we find this to be persuasive evidence that the States considered such changes permissible.
Montana argues that, regardless of the statutes, private lawsuits could be brought to challenge such efficiency changes. But it has not provided a single example from either State. Instead, Montana and Wyoming cases typically describe the no-injury rule as applying to changes in point of diversion, purpose of use, and place of use. See, e.g., Maclay v. Missoula Irrig. Dist., 90 Mont. 344, 355-357, 3 P. 2d 286, 291 (1931); Thayer v. Rawlins, 594 P. 2d 951, 955 (Wyo. 1979). The abundance of litigation over such changes — and the absence of any litigation over the sort of change at issue here — strongly implies that irrigation efficiency improvements do not violate the no-injury rule and were considered within the scope of the original appropriative right.
2
The doctrine of recapture also supports treating improvements in irrigation efficiency as within the original appropriative right. Under this doctrine, an appropriator who has diverted water for irrigation purposes has the right to recapture and reuse his own runoff and seepage water before it escapes his control or his property.[7] An appropriator is entitled to the “exclusive control [of his appropriated water] so long as he is able and willing to apply it to beneficial uses, and such right extends to what is commonly known as wastage from surface run-off and deep percolation, necessarily incident to practical irrigation.” Ide v. United States, 263 U. S. 497, 506 (1924) (internal quotation marks omitted); see also Arizona Pub. Serv. Co. v. Long, 160 Ariz. 429, 437-438, *381 773 P. 2d 988, 996-997 (1989) (“No appropriator can compel any other appropriator to continue the waste of water which benefits the former. If the senior appropriator, through scientific and technical advances, can utilize his water so that none is wasted, no other appropriator can complain”).
Montana contends that this rule does not apply when the runoff or seepage water would, if not recaptured, return to the same stream from which it was originally drawn. There is some support for Montana’s position — that a beneficial user may not reuse water at all, even while it is still on his property, if it otherwise would flow back to the same stream — especially in Utah and Colorado cases. See Deseret Irrig. Co., supra, at 180-182, 271 P. 2d, at 456-457; Estate of Steed v. New Escalante Irrig. Co., 846 P. 2d 1223, 1226 (Utah 1992); Comstock v. Ramsay, 55 Colo. 244, 252-258, 133 P. 1107, 1110-1111 (1913).[8] But other authorities draw no such exception based on where the runoff or seepage is heading. See 2 Hutchins 580-582 (asserting that, even in Utah, “where the original appropriator retains possession and control of the waste and seepage water from irrigation of his lands, he is entitled to reuse these waters for his own benefit and need not return them to the channel from which they were diverted” (emphasis added)); Getches 139-145; Woolman v. Garringer, 1 Mont. 535 (1872). And Montana cites no case from either State here in which a court has recognized, much less found controlling, the idea that a water user may not reuse his own wastewater while it is still on his property simply because it otherwise would return to the original stream.
*382 In fact, Montana and Wyoming appear to apply, without qualification, the basic doctrine that the original appropriator may freely recapture his used water while it remains on his property and reuse it for the same purpose on the same land. For example, in Binning v. Miller, 55 Wyo. 451, 102 P. 2d 54 (1940), a man was diverting water from a creek fed largely by irrigation runoff and seepage from Binning’s property. Although the court found that the man had a right to that water once Binning’s runoff and seepage had become a natural stream, it noted that his right remained subject to Binning’s right “to use the water above mentioned for beneficial purposes upon the land for which the seepage water was [originally] appropriated.” Id., at 477, 102 P. 2d, at 63. In a later case, the court explained that the man could not “secure a permanent right to continue to receive the water” because Binning “might find better ways of utilizing the water on the same land so that less waste and seepage would occur.” Bower v. Big Horn Canal Assn., 77 Wyo. 80, 101, 307 P. 2d 593, 601 (1957).
Similarly, in Bower v. Big Horn Canal Assn., the court held that Bower could appropriate water as it seeped across his property from the Big Horn Canal toward a nearby river. Id., at 102-104, 307 P. 2d, at 602. The court added, however, that Bower’s right was subject always to the Big Horn Canal’s right: “No appropriator can compel any other appropriator to continue the waste of water which benefits the former.” Id., at 101, 307 P. 2d, at 601. Importantly, the court noted that “[i]f the senior appropriator by a different method of irrigation can so utilize his water that it is all consumed in transpiration and consumptive use and no waste water returns by seepage or percolation to the river, no other appropriator can complain.” Ibid.
Finally, in Fuss v. Franks, 610 P. 2d 17 (Wyo. 1980), water was seeping from Fuss’ property and into a pit in a public right of way. Franks was the first to appropriate the water *383 from the pit. The court upheld Franks’ appropriation right because the water had already escaped from Fuss’ property. The court said that the “owner of land upon which seepage or waste water rises has the right to use and reuse — capture and recapture — such waste waters,” but only before the water escapes his land, and “for use only upon the land for which the water forming the seepage was originally appropriated.” Id., at 20 (internal quotation marks omitted). Fuss thus had no superior right to the water that had left his property, and especially not for reuse on other lands.
The law in Montana is similar. The Montana Supreme Court has explained that “the general rule ... is that the owner of the right to use the water — his private property while in his possession, — may collect it, recapture it, before it leaves his possession.” Rock Creek Ditch & Flume Co. v. Miller, 93 Mont. 248, 268, 17 P. 2d 1074, 1080 (1933); see also A. Stone, Montana Water Law 66 (1994) (noting that, according to the “early cases,” while “the water is still seeping and running off one’s own land, the landowner is free to recapture and further use it”).
The right of recapture discussed in these authorities is broad. As the Special Master recognized, the “language of the Wyoming Supreme Court... was expansive” in Binning, Bower, and Fuss, and “all appear to hold that an appropriator in Wyoming can increase his water use efficiency by recovering runoff on his property or through other means so long as the increased consumption is on the same land to which the appropriative right attaches.” Report 81; see also id., at 78-85; Thompson, Case Note, Water Law — Reusing Irrigation Waste Water on Different Lands: A Warning To Get a New Permit, Fuss v. Franks, 610 P 2d 17 (Wyo. 1980), 16 Land & Water L. Rev. 71, 76 (1981) (concluding that in Wyoming, “a prior appropriator can at anytime, utilize irrigation methods that are totally consumptive, such as pumping the collected waste water back to the top of the *384 field or installing a sprinkler system, thereby eliminating all waste of water”); Jones, Note, Rights of the Original Appropriator To Recapture Water Used in Irrigation, 11 Wyo. L. J. 39 (1956); Wille, Note, The Right To Use Waste Water Before It Re-enters the Stream, 12 Wyo. L. J. 47, 48 (1957).
The Wyoming and Montana doctrine of recapture strongly suggests that improvements in irrigation efficiency are within the original appropriative right of Wyoming’s pre1950 water users. By using sprinklers rather than flood irrigation, those water users effectively recapture water. The sprinklers, by reducing loss due to seepage and runoff, operate much like, if more efficiently than, cruder recapture systems involving ditches or pits. They are simply different mechanisms for increasing the volume of water available to the crops without changing the amount of diversion. Binning, Bower, and Fuss expressly acknowledged that in such situations, lower appropriators who have perfected their own appropriative rights are nonetheless at the mercy of the property owners from which their water flows. See 55 Wyo., at 474-477, 102 R 2d, at 63; 77 Wyo., at 100-104, 307 P. 2d, at 601-602; 610 P. 2d, at 20.
3
Our conclusion is consistent with that of water law scholars who have considered the specific question presented in this ease. One scholar asserted: “[0]f course, increasing efficiency at one site may reduce the amount of water available to downstream users who may rely on return flows from other users. [Wyoming] law, however, does not preclude more efficient uses merely because a downstream user may be injured.” Squillace, A Critical Look at Wyoming Water Law, 24 Land & Water L. Rev. 307, 331 (1989); see ibid., n. 156 (“For example, a farmer who traditionally consumes only 50% of the water applied to his land is free to change his crop or method of applying water so as to increase his consumption to 60%”); see also Thompson, supra, at 76 (“[A] *385 prior appropriator can at anytime . . . instal[l] a sprinkler system, thereby eliminating all waste of water”). And a national hornbook on water law has observed:
“The rule allowing recapture and reuse of salvaged water on the original land can result in more water being consumed. For instance, if a water user is consuming less than the permitted amount of water and plants a more water-intensive crop or puts in a more efficient irrigation system, most or all of the water that had previously been returned to the stream might be consumed. This can deprive other appropriators of water on which they depend but it is allowed since it is technically within the terms of the original appropriation.” Getches 143-144.
Montana has not identified any scholars who have reached the opposite conclusion.
For all of these reasons, we hold that the doctrine of appropriation in Wyoming and Montana allows appropriators to improve their irrigation systems, even to the detriment of downstream appropriators. We readily acknowledge that this area of law is far from clear. See supra, at 377. But the apparent scope of the no-injury rule in Wyoming and Montana, the doctrine of recapture and its broad reach in Wyoming and Montana case law, and the specific conclusions of water law scholars all point in the same direction, which also comports with the Special Master’s exhaustive discussion and findings. Accordingly, if Article V(A) simply incorporates background principles of appropriation law, it allows Wyoming’s pre-1950 water users to improve their irrigation efficiency, even to the detriment of Montana’s pre-1950 users.
B
Montana, however, takes another tack. It argues that even if background principles of appropriation law do not support its position, Article V(A) of the Compact does not *386 protect the Ml scope of ordinary appropriative rights. Montana claims that the Compact’s definition of “beneficial use” restricts the scope of protected pre-1950 appropriative rights to the net volume of water that was actually being consumed in 1950. We agree with the Special Master that this argument also fails.
1
Article V(A) protects “[a]ppropriative rights to the beneficial uses of... water.” “Beneficial use,” in turn, is defined in Article 11(H) as “that use by which the water supply of a drainage basin is depleted when usefully employed by the activities of man.” 65 Stat. 665. Montana contends that “beneficial use” is thus defined as the amount of depletion. According to Montana, any activity that increases pre-1950' water users’ depletions in Wyoming beyond pre-1950 levels exceeds the scope of the appropriative rights that Article V(A) protects. See Brief for Montana 25-28. On this basis, Montana asserts that the Compact requires (subject to river conditions) that the same quantity of water that was reaching Montana as of January 1, 1950, continue to do so. Id., at 26.
2
We acknowledge that “beneficial use” refers to a type of use that involves some depletion, as all irrigation does. See Report 61. The part of the Compact’s definition of “beneficial use” that refers to depletion — “that use by which the water supply... is depleted” — is fairly clear. It begins with “that use,” and the words that follow merely explain that “that use” must be a use that “deplete[s]” the “water supply.” Nothing in the language suggests that “beneficial use” means a measure of the amount of water depleted. A “beneficial use” within the meaning of the Compact, therefore, is a type of use that depletes the water supply.
This plain reading makes sense in light of the circumstances existing in the signatory States when the Compact was drafted. At that time, Wyoming had a statutory prefer *387 enee for irrigation, a type of depletive use, over power generation, a nondepletive use. Wyo. Comp. Stat. Ann. § 71-402 (1945). It makes sense that the Compact would have been written to protect the irrigation uses that were legislatively favored and represented the predominant use of the Yellowstone River system. See Tr. of Oral Arg. 45-47; 65 Stat. 663 (Compact Preamble) (noting that the Compact recognizes “the great importance of water for irrigation in the signatory States”).
Montana’s reading of the Compact, by contrast, does not follow from the text and would drastically redefine the term “beneficial use” from its longstanding meaning. The amount of water put to “beneficial use” has never been defined by net water consumption. The quantity of water “beneficially used” in irrigation, for example, has always included some measure of necessary loss such as runoff, evaporation, deep percolation, leakage, and seepage (regardless of whether any of it returns to the stream). So, water put to “[b]eneficial use is not what is actually consumed but what is actually necessary in good faith.” 1 Wiel §481, at 509; see also Trelease, The Concept of Reasonable Beneficial Use in the Law of Surface Streams, 12 Wyo. L. J. 1, 10 (1957) (listing irrigation as a beneficial use and noting that “the method of application, by flooding, channeling, or sprinkling, is immaterial”); J. Sax, B. Thompson, J. Leshy, & R. Abrams, Legal Control of Water Resources 131 (4th ed. 2006) (discussing normal irrigation practices and observing that the amount of water put to beneficial use “is often considerably more than the quantum actually consumed”).
If the Compact’s definition of “beneficial use” were meant to drastically redefine the term into shorthand for net water consumption, we would expect far more clarity. For example, the Compact could have stated that it would protect “only 'the amount of water consumed for a beneficial use in each signatory state as of January 1, 1950.’” Report 60. Or it could have defined “beneficial use” as the “volume by *388 which the water supply ... is depleted.” Moreover, if the Compact effected a dramatic reframing of ordinary appropriation principles, the rest of Article V(A), which expressly states that “the laws governing the acquisition and use of water under the doctrine of appropriation” control, would make little sense.
We agree with the Special Master that the definition of beneficial use in the Compact is unremarkable. Article V(A) does not change the scope of the pre-1950 appropriative rights that it protects in both States.
3
Finally, if Article V(A) were intended to guarantee Montana a set quantity of water, it could have done so as plainly as other compacts that do just that. By 1950, Wyoming itself had entered into at least one compact that defined water rights in terms of depletion. The Colorado River Compact of 1922 apportioned 7,500,000 acre-feet of water per year for “the exclusive beneficial consumptive use” of several upstream States, including Wyoming. National Resources Planning Bd., Water Resources Comm., Interstate Water Compacts, 1785-1941, p. 7 (1942). That compact specifically added that “[t]he States of the Upper Division will not cause the flow of the river at Lee Ferry to be depleted below an aggregate of 75,000,000 acre feet for any period of ten consecutive years . . . .” Id., at 8. See also Republican River Compact (1943), Kan. Stat. Ann. § 82a-518 (1997) (allocating water by the acre-foot for beneficial consumptive use in Kansas, Nebraska, and Colorado). And, even here in the Yellowstone River Compact, Article V(B) unambiguously apportions the third tier of Yellowstone River system water by percentage. 65 Stat. 666. The notion that Article V(A) accomplishes essentially the same sort of depletive allocation with language that has a different and longstanding meaning is simply unpersuasive.
*389 * * *
We conclude that the plain terms of the Compact protect ordinary “[a]ppropriative rights to the beneficial uses of [water] . . . existing in each signatory State as of January 1, 1950.” Art. V(A), ibid. And the best evidence we have shows that the doctrine of appropriation in Wyoming and .Montana allows appropriators to improve the efficiency of their irrigation systems, even to the detriment of downstream appropriators. Montana’s allegation that Wyoming has breached Article V(A) of the Compact by allowing its pre-1950 water users to increase their irrigation efficiency thus fails to state a claim. Accordingly, Montana’s first exception to the Special Master’s First Interim Report is overruled.

It is so ordered.

Justice Kagan took no part in the consideration or decision of this case.

 Montana has since clarified that increased consumption on existing acreage refers to the use of more efficient irrigation systems. The “efficiency” of irrigation for our purposes refers to the amount of wastewater that is lost, for example, to evaporation, seepage, runoff, or deep percolation. Some of the lost water returns to the river and is later available for downstream users. A more efficient irrigation system loses less water; thus, though it may draw the same volume of water from the river, net water consumption is increased.

 Montana also raised an exception to the Special Master’s finding that if Montana can remedy the shortage of water to its pre-1950 users by curtailing its post-1950 uses without “prejudicing] Montana’s other rights under the Compact,” then an intrastate remedy is “the appropriate solution.” Report 15. We recommitted this exception to the Special Master. 562 U. S. 958 (2010).

 For purposes of resolving Wyoming’s motion to dismiss, we take as true Montana’s allegation that the new sprinkler systems actually reduce return flow to the rivers. Wyoming has not conceded that this is true. See Wyoming’s Reply to Montana’s Exception 35, n. 6.

 As with all contracts, we interpret the Compact according to the intent of the parties, here the signatory States. We thus look primarily to the doctrine of appropriation in Wyoming and Montana, but, like the States, we also look to Western water law more generally and authorities from before and after 1950. The States appear to have assumed that the doctrine has not changed in a way directly relevant here. We therefore do not decide whether Article V(A) intended to freeze appropriation law as it stood in 1949, or whether it incorporates the evolution of the doctrine over time, allowing Compact-protected rights to grow or shrink accordingly. We resolve the matter of Montana’s exception without prejudice to that issue. See Report 39-40.

 The lack of clarity in this area of water law highlights the sensitive nature of our inquiry and counsels caution. Our original jurisdiction over eases between States brings us this dispute between Montana and Wyoming about the meaning of their eongressionally approved Yellowstone River Compact. See U. S. Const., Art. III, §2, cl. 2; 28 U. S. C. *378 § 1251(a). Yet, because the Compact references and the parties direct us to principles of appropriation doctrine, we find ourselves immersed in state water law. See n. 4, swpra. Our assessment of the scope of these water rights is merely a federal court’s description of state law.
The highest court of each State, of course, remains “the final arbiter of what is state law.” West v. American Telephone & Telegraph Co., 311 U. S. 223, 236 (1940). We recognize that appropriation doctrine continues to evolve, and there are reasonable policy arguments in favor of both States’ positions here. But it is not this Court’s role to guide the development of state water regulation. See id., at 237 (“[I]t is the duty of [federal courts] in every case to ascertain from all the available data what the state law is and apply it rather than to prescribe a different rule, however superior it may appear from the viewpoint of 'general law’ ”). Our decision is not intended to restrict the States’ determination of their respective appropriation doctrines.

 Mont. Rev. Code Ann. §89-803; Wyo. Comp. Stat. Ann. §71-401 (1945) (water rights “cannot be detached from the lands, place or purpose for which they are acquired” outside of specific exceptions); see also 1885 Mont. Laws p. 131, §3.

 And in some narrowly defined circumstances, he retains this right even after the water leaves his property. See 1 Wiel §§ 38-40, at 37-43.

 Colorado has a relatively unique doctrine of recapture. See Hoese, Comment, Recapture of Reclamation Project Ground Water, 53 Cal. L. Rev. 541, 544, n. 18 (1965) (noting the general doctrine of recapture, and adding that “[t]he Colorado rule, however, is to the contrary”); United States v. Tilley, 124 F. 2d 850, 858 (CA8 1941) (allowing recapture by the original appropriator under Nebraska law, and noting Colorado’s opposite rule).