**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff*,

WALKER RIVER PAIUTE TRIBE,
*Intervenor-Plaintiff*,

NATIONAL FISH AND WILDLIFE
FOUNDATION,
*Petitioner*,

MINERAL COUNTY,
*Intervenor-Plaintiff*,

and

NEVADA STATE ENGINEER,
*Respondent-Appellant*,

v.

UNITED STATES BOARD OF WATER
COMMISSIONERS,
*Participant-Appellee*,

BACKTRACK, LLC; BALE COUNTER,
INC.; GARY M. BERRINGTON;
BERRINGTON CUSTOM HAY
HAULING & TRANS., INC.; DAMIAN,
LTD.; PETER A. FENILI; GDA

No. 15-16316

D.C. No.
3:73-cv-00125-
RCJ-WGC

DEGREE, INC.; GARY G. GARMS;
GARY J. GARMS; KARI D. GARMS;
TONI GARMS; GARMSLAND LIMITED,
LLC; HIGH SIERRA GARLIC;
JACKAROO, LLC; SETTELMEYER-
ROSSE RANCH MANAGEMENT, LLC;
SIX-N-RANCH, INC.; STRAGGLER,
LLC,

*Objectors-Appellees*,

and

NEVADA DEPARTMENT OF WILDLIFE;
CALIFORNIA STATE WATER
RESOURCES CONTROL BOARD;
MONO COUNTY, CALIFORNIA; LYON
COUNTY, NEVADA,

*Respondents*,

WALKER LAKE WORKING GROUP;
WALKER RIVER IRRIGATION
DISTRICT,

*Defendants.*

UNITED STATES OF AMERICA,
*Plaintiff*,

WALKER RIVER PAIUTE TRIBE,
*Intervenor-Plaintiff*,

NATIONAL FISH AND WILDLIFE
FOUNDATION,
*Petitioner*,

MINERAL COUNTY,
*Intervenor-Plaintiff*,

and

NEVADA DEPARTMENT OF WILDLIFE,
*Respondent-Appellant*,

v.

UNITED STATES BOARD OF WATER
COMMISSIONERS,
*Participant-Appellee*,

BACKTRACK, LLC; BALE COUNTER,
INC.; GARY M. BERRINGTON;
BERRINGTON CUSTOM HAY
HAULING & TRANS., INC.; DAMIAN,
LTD.; PETER A. FENILI; GDA
DEGREE, INC.; GARY G. GARMS;
GARY J. GARMS; KARI D. GARMS;
TONI GARMS; GARMSLAND LIMITED,
LLC; HIGH SIERRA GARLIC;

No. 15-16317

D.C. No.
3:73-cv-00125-
RCJ-WGC

JACKAROO, LLC; SETTELMEYER-
ROSSE RANCH MANAGEMENT, LLC;
SIX-N-RANCH, INC.; STRAGGLER,
LLC,

*Objectors-Appellees*,

and

NEVADA STATE ENGINEER;
CALIFORNIA STATE WATER
RESOURCES CONTROL BOARD;
MONO COUNTY, CALIFORNIA; LYON
COUNTY, NEVADA,

*Respondents*,

WALKER LAKE WORKING GROUP;
WALKER RIVER IRRIGATION
DISTRICT,

*Defendants.*

UNITED STATES OF AMERICA,
            *Plaintiff*,

WALKER RIVER PAIUTE TRIBE,
            *Intervenor-Plaintiff*,

MINERAL COUNTY,
            *Intervenor-Plaintiff*,

            and

NATIONAL FISH AND WILDLIFE
FOUNDATION,
            *Petitioner-Appellant*,

            v.

UNITED STATES BOARD OF WATER
COMMISSIONERS,
            *Participant-Appellee*,

BACKTRACK, LLC; BALE COUNTER,
INC.; GARY M. BERRINGTON;
BERRINGTON CUSTOM HAY
HAULING & TRANS., INC.; DAMIAN,
LTD.; PETER A. FENILI; GDA
DEGREE, INC.; GARY G. GARMS;
GARY J. GARMS; KARI D. GARMS;
TONI GARMS; GARMSLAND LIMITED,
LLC; HIGH SIERRA GARLIC;
JACKAROO, LLC; SETTELMEYER-
ROSSE RANCH MANAGEMENT, LLC;
SIX-N-RANCH, INC.; STRAGGLER,

No. 15-16319

D.C. No.
3:73-cv-00125-
RCJ-WGC

LLC,

*Objectors-Appellees*,

and

NEVADA STATE ENGINEER; NEVADA
DEPARTMENT OF WILDLIFE;
CALIFORNIA STATE WATER
RESOURCES CONTROL BOARD;
MONO COUNTY, CALIFORNIA; LYON
COUNTY, NEVADA,

*Respondents*,

WALKER LAKE WORKING GROUP;
WALKER RIVER IRRIGATION
DISTRICT,

*Defendants.*

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff*, | No. 15-16321 |
| WALKER RIVER PAIUTE TRIBE, *Intervenor-Plaintiff*, | D.C. No. 3:73-cv-00125-RCJ-WGC |
| NATIONAL FISH AND WILDLIFE FOUNDATION, *Petitioner*, | |
| MINERAL COUNTY, *Intervenor-Plaintiff*, | |
| and | |
| WALKER RIVER IRRIGATION DISTRICT, *Defendant-Appellant*, | |
| v. | |
| UNITED STATES BOARD OF WATER COMMISSIONERS, *Participant-Appellee*, | |
| BACKTRACK, LLC; BALE COUNTER, INC.; GARY M. BERRINGTON; BERRINGTON CUSTOM HAY HAULING & TRANS., INC.; DAMIAN, LTD.; PETER A. FENILI; GDA DEGREE, INC.; GARY G. GARMS; GARY J. GARMS; KARI D. GARMS; TONI GARMS; GARMSLAND LIMITED, | |

LLC; HIGH SIERRA GARLIC;
JACKAROO, LLC; SETTELMEYER-
ROSSE RANCH MANAGEMENT, LLC;
SIX-N-RANCH, INC.; STRAGGLER,
LLC,
                    *Objectors-Appellees*,

                    and

NEVADA STATE ENGINEER; NEVADA
DEPARTMENT OF WILDLIFE; MONO
COUNTY, CALIFORNIA; LYON
COUNTY, NEVADA,
                    *Respondents*,

WALKER LAKE WORKING GROUP,
                    *Defendant.*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*, | No. 15-16323 |
| WALKER RIVER PAIUTE TRIBE,<br>*Intervenor-Plaintiff*, | D.C. No.<br>3:73-cv-00125-<br>RCJ-WGC |
| NATIONAL FISH AND WILDLIFE<br>FOUNDATION,<br>*Petitioner*, | |
| and | |
| MINERAL COUNTY,<br>*Intervenor-Plaintiff-Appellant*, | |
| WALKER LAKE WORKING GROUP,<br>*Defendant-Appellant*, | |
| v. | |
| UNITED STATES BOARD OF WATER<br>COMMISSIONERS,<br>*Participant-Appellee*, | |
| BACKTRACK, LLC; BALE COUNTER,<br>INC.; GARY M. BERRINGTON;<br>BERRINGTON CUSTOM HAY<br>HAULING & TRANS., INC.; DAMIAN,<br>LTD.; PETER A. FENILI; GDA<br>DEGREE, INC.; GARY G. GARMS;<br>GARY J. GARMS; KARI D. GARMS;<br>TONI GARMS; GARMSLAND LIMITED,<br>LLC; HIGH SIERRA GARLIC; | |

JACKAROO, LLC; SETTELMEYER-
ROSSE RANCH MANAGEMENT, LLC;
SIX-N-RANCH, INC.; STRAGGLER,
LLC,
                    *Objectors-Appellees*,

            and

NEVADA STATE ENGINEER; NEVADA
DEPARTMENT OF WILDLIFE; MONO
COUNTY, CALIFORNIA; LYON
COUNTY, NEVADA,
                    *Respondents*,

WALKER RIVER IRRIGATION
DISTRICT,
                    *Defendant*.

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*, | No. 15-16489 |
| NATIONAL FISH AND WILDLIFE<br>FOUNDATION,<br>*Petitioner*, | D.C. No.<br>3:73-cv-00125-<br>RCJ-WGC |
| MINERAL COUNTY,<br>*Intervenor-Plaintiff*, | ORDER AND<br>AMENDED<br>OPINION |
| and | |
| WALKER RIVER PAIUTE TRIBE,<br>*Intervenor-Plaintiff-Appellant*, | |
| v. | |
| UNITED STATES BOARD OF WATER<br>COMMISSIONERS,<br>*Participant-Appellee*, | |
| BACKTRACK, LLC; BALE COUNTER,<br>INC.; GARY M. BERRINGTON;<br>BERRINGTON CUSTOM HAY<br>HAULING & TRANS., INC.; DAMIAN,<br>LTD.; PETER A. FENILI; GDA<br>DEGREE, INC.; GARY G. GARMS;<br>GARY J. GARMS; KARI D. GARMS;<br>TONI GARMS; GARMSLAND LIMITED,<br>LLC; HIGH SIERRA GARLIC;<br>JACKAROO, LLC; SETTELMEYER-<br>ROSSE RANCH MANAGEMENT, LLC; | |

SIX-N-RANCH, INC.; STRAGGLER,
LLC,

        *Objectors-Appellees*,

and

NEVADA DEPARTMENT OF WILDLIFE;
NEVADA STATE ENGINEER;
CALIFORNIA STATE WATER
RESOURCES CONTROL BOARD;
MONO COUNTY, CALIFORNIA; LYON
COUNTY, NEVADA,

        *Respondents*,

WALKER LAKE WORKING GROUP;
WALKER RIVER IRRIGATION
DISTRICT; JOSEPH LANDOLT;
BEVERLY LANDOLT,

        *Defendants*.

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued and Submitted August 30, 2017
Pasadena, California

Filed May 22, 2018
Amended June 22, 2018

Before: A. Wallace Tashima, Raymond C. Fisher,
and Jay S. Bybee, Circuit Judges.

Order;
Opinion by Judge Bybee

## SUMMARY[*]

### Water Rights

The panel reversed the district court's judgment and remanded in an action brought by farmers who alleged injury to their water rights arising from state agency approval of modifications to a water rights leasing program in the Walker River Basin.

The Nevada district court has maintained in rem jurisdiction over the waters of Walker River in accordance with the Walker River Decree of 1936, which governs the water rights in the Walker River Basin.  In 2009, Congress established the Walker Basin Restoration Program, which allocated funding to be administered by the National Fish and Wildlife Foundation to acquire water and water rights for the purpose of restoring and maintaining Walker Lake, the terminus of the Walker River.  Under the program, the Foundation leases or purchases flow and storage rights from willing sellers, and uses those rights to convey water downstream to feed the Lake.

The Foundation and the Walker River Irrigation District both submitted applications seeking modifications to their decreed water rights.  The Foundation requested changes to

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

the place of use where water was diverted, and changes to the purpose of use from irrigation to wildlife purposes. The Nevada State Engineer approved the Foundation's application, finding that no party would suffer injury from the changes because the Foundation agreed to limit its in-stream water use to the historic consumptive use portion of its decreed water rights, the amount actually used and consumed by agriculture, and to dedicate to the non-consumptive portion to mitigate hydrological system loss.

The California State Water Control Board approved the separate application of the Irrigation District to temporarily change its decreed water storage rights, finding that the farmers who objected to the proposed changes failed to demonstrate any right to the stored water that would be injured. The district court rejected the state agency rulings, refused to grant the change applications, and remanded to the state agencies after finding that the proposed modifications would injure the water rights of farmers.

The panel held that (1) it had jurisdiction over the action because the district court's remand order was sufficiently final, (2) state law applied, (3) it would review the district court's decision de novo, and (4) the district court was required to afford the same level of deference to the state agencies as the state courts would.

The panel held that the district court failed to defer to the findings and conclusions of the state agencies. The panel considered the record before the Nevada State Engineer, and concluded that the Engineer properly found that a transfer to the Foundation limited to the consumption portion would avoid conflict and injury to other existing water rights. The panel held that the findings were supported by substantial

evidence and that the Engineer applied the correct legal rule. The panel held that to the extent the district court made its own findings of fact, those findings were clearly erroneous. The panel further held that the California State Water Control Board's finding that the changes proposed by the Irrigation District "would not injure any legal use of the water" was consistent with the Walker River Decree of 1936 and in accord with California law.

The panel held that Walker Lake is part of the Walker River Basin. Consequently, the panel held that dedicating water from the Walker River to Walker Lake did not violate the Decree's prohibition on delivering water outside of the basin of the Walker River. The panel reversed the district court's judgment, vacated the district court's opinion and remanded for approval of the change applications.

---

## COUNSEL

Don Springmeyer (argued) and Christopher Mixson, Wolf Rifkin Shapiro Schulman & Rabkin LLP, Las Vegas, Nevada; Jamie Morin, Mentor Law Group PLLC, Seattle, Washington; for Petitioner-Appellant National Fish and Wildlife Foundation.

Micheline Noel Nadeau Fairbank (argued) and Bryan L. Stockton, Senior Deputy Attorneys General; Adam Paul Laxalt, Attorney General; Office of the Attorney General, Carson City, Nevada; for Respondent-Appellant State of Nevada.

Gordon DePaoli (argued) and Dale E. Ferguson, Woodburn and Wedge, Reno, Nevada, for Defendant-Appellant Walker River Irrigation District.

Simeon Herskovits (argued), Advocates for Community & Environment, El Prado, New Mexico; Sean A. Rowe, Mineral County District Attorney, Hawthorne, Nevada; for Plaintiff-Intervenor-Plaintiff-Appellant Mineral County and Defendant-Appellant Walker Lake Working Group.

Wes Williams Jr., Law Offices of Wes Williams Jr. P.C., Schurz, Nevada, for Intervenor-Plaintiff-Appellant Walker River Paiute Tribe.

Karen A. Peterson (argued), Justin M. Townsend, Kyle A. Winter, and Willis M. Wagner, Allison MacKenzie Ltd., Carson City, Nevada, for Participant-Appellee United States Board of Water Commissioners.

Elizabeth Ann Peterson, David L. Negri, Andrew "Guss" Guarino, Katherine J. Barton, David C. Shilton, and William B. Lazarus, Attorneys; John C. Cruden, Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Amicus Curiae United States of America.

Jan Zabriskie, Deputy Attorney General; Annadel A. Almendras and Tracy L. Winsor, Supervising Deputy Attorneys General; Robert W. Byrne, Senior Assistant Attorney General; Office of the Attorney General, Sacramento, California; for Amicus Curiae California State Water Resources Control Board.

## ORDER

Amicus the California State Water Resources Control Board's request for modification filed in 15-16321 and 15-16323 on June 7, 2018 is **GRANTED**.

The Opinion filed May 22, 2018, appearing at 890 F.3d 1134, is amended as follows:

1. At 890 F.3d 1146, footnote 11, replace "The California Control Board only has authority over water rights established after 1914, when the Board was created. *See Nat. Res. Def. Council v. Kempthorne*, 621 F. Supp. 2d 954, 963 (E.D. Cal. 2009)." with "The California Control Board has permitting and licensing authority only over water rights established after 1914, when the Board was created. *Cal. Farm Bureau Fed'n v. State Water Res. Control Bd.*, 247 P.3d 112, 117–18 (Cal. 2011).  In some circumstances the California Control Board may approve a petition for change in point of diversion, place of use, or purpose of use under riparian or pre-1914 appropriative rights. *See*, *e.g.*, *id.* at 117–20; CAL. WATER CODE § 1707."

2. At 890 F.3d 1152, replace "over which the Board lacks statutory authority" with "over which the Board lacks permitting and licensing authority."

## OPINION

BYBEE, Circuit Judge:

Water was plentiful when the first settlers arrived in northwestern Nevada ten thousand years ago. Massive Lake Lahontan spread from the Sierra Nevada to the Carson Sink, the Black Rock Desert, and as far as California and Oregon. "The world," they said, "was all water."[1] Lake Lahontan has slowly vanished over the years, and now survives only in the form of a few desert lakes, including the subject of this case, Walker Lake, the terminus of the Walker River.

Walker Lake has suffered since the 1860s, when the River's waters were first diverted for agriculture, and the Lake's volume has plummeted precipitously in recent years. In response, federal, state, tribal, local, and private organizations and authorities have banded together to save the Lake. The federal program at issue in this case is a voluntary water rights leasing program managed by the National Fish and Wildlife Foundation ("NFWF") to convey water from Walker River downstream to the Lake as part of the federal Walker Basin Restoration Program. Like duck stamps and emissions markets, NFWF's program proposes to employ free market forces to restore a natural balance between the competing demands of agriculture and conservation.

The Nevada State Engineer and the California State Water Resources Control Board approved change applications for NFWF's program over the objections of farmers ("the Farmers") who claim injury to their water rights. The

---

[1] NEVADA: A GUIDE TO THE SILVER STATE 218 (Nev. State Historical Soc'y, Inc. 1940).

Farmers brought their complaints to the district court which, as the Decree court, has maintained in rem jurisdiction over the waters of Walker River since 1902 in accordance with the Walker River Decree of 1936.  The Decree court rejected the state agency rulings, and found that the program, as proposed, would injure the Farmers' water rights.

We examine two questions.  First, did the Decree court properly reject the state agency rulings—that NFWF's program would not cause any cognizable injury to the Farmer's water rights—based on its de novo review of the Walker River Decree?  Second, does the export restriction of the Walker River Decree prohibit delivering water to Walker Lake because it is "outside of" the Walker River Basin?  We answer both questions in the negative, reverse the judgment of the Decree court, and remand for approval of the change applications.

## I.  FACTS AND PROCEDURAL HISTORY

A.  *The River and the Lake*

The Walker River consists of two forks that begin in California and end in Nevada.  The West Walker River springs from the Emigrant Wilderness of Stanislaus National Forest, and flows through Topaz Lake and north into Nevada's Smith and Mason Valleys.  The East Walker River springs from the Hoover Wilderness, passes through Bridgeport Reservoir and into Nevada east of the Wovoka Wilderness and Bald Mountain, before streaming into Mason Valley.  The forks join by Yerington and flow north to Wabuska, before turning southeasterly through the land of the Walker River Paiute Tribe ("the Tribe").  *See United States v. Walker River Irrigation Dist.*, 11 F. Supp 158, 161

(D. Nev. 1935).  From there, the River flows through Weber Reservoir and Schurz, and into Walker Lake.  *See id*. at 160–62.

Walker Lake is about 13 miles long by 5 miles wide, tucked against the east side of the Wassuk Range in Mineral County, Nevada.  It is one of the last few puddle remnants of ancient Lake Lahontan.[2]  For centuries, the Lake served an important ecological role as fishery for the native Lahontan Cutthroat Trout—the state fish of Nevada—and as home and resting grounds for hundreds of species, including fish, insects, migratory birds, and wild horses.[3]  Human life at the Lake is quite ancient as well, dating back to the spearheads in

---

[2] NEVADA: A GUIDE TO THE SILVER STATE 218 (Nev. State Historical Soc'y, Inc. 1940) ("In the steadfast intensity of its color and the beauty of its setting Walker Lake is one of the most impressive lakes in the West. As deeply and opaquely blue as the Mediterranean, under bright sunlight it looks like a field of heavy liquid of unfathomable depth. . . .  The lake, impressive in its wild setting, has been the subject of numerous tall tales and people are occasionally met who swear that they have glimpsed the fabulous monster supposed to live in its blue depths.").

[3] In March 1885, a local publication "reported that Walker Lake was so crowded with Lahontan cutthroat trout that during the middle of the day long rows of the fish could be seen lying at the water's edge on the sand sunning themselves."  Gary A. Horton, WALKER RIVER CHRONOLOGY II-12–13 (1996) (quoting the Walker Lake Bulletin), *available at* http://images.water.nv.gov/images/publications/River%20Chronologies /Walker%20River%20Chronology.pdf; *see also* Saxon E. Sharpe, et al., Desert Research Institute, Pub. No. 41231, THE WALKER BASIN, NEVADA AND CALIFORNIA: PHYSICAL ENVIRONMENT, HYDROLOGY AND BIOLOGY 27–32 (2008) ("DRI Report").

Mastodon bones and the petroglyphs carved by the Lake's northern shores.[4]

By the early 1860s, miners looked to the mountains of the Walker River Basin, seeking the same silver bonanzas unearthed in the Comstock Lode near Lake Tahoe. Following expanded mining operations, innovators in irrigation technology arrived to make the desert bloom. They succeeded. The Smith and Mason Valleys soon became the picturesque and fertile agricultural region they are today. More than half of the valley farmland is dedicated to alfalfa, Nevada's cash crop.

As agriculture boomed, water flows to Walker Lake diminished. *See* DRI Report, *supra* note 3, at 7. Between 1882 and 2007, the Lake's volume plummeted from nine million to two million acre feet and its salinity rose from 2,500 mg/L total dissolved solids (TDS) to 16,000 mg/L TDS.[5] Just a few years later in 2013, salinity exceeded 20,000 mg/L TDS.[6] Lahontan cutthroat trout die in such a saline environment; they and many other Lake residents have

---

[4] NEVADA: A GUIDE TO THE SILVER STATE 24 (Nev. State Hist. Soc., Inc. 1940).

[5] DRI Report at 7; Michael W. Collopy & James M. Thomas, Desert Research Institute, RESTORATION OF A DESERT LAKE IN AN AGRICULTURALLY DOMINATED WATERSHED: THE WALKER LAKE BASIN ii–vii (2016), http://greatbasinresearch.com/walker/downloads/2016-Walker-Report-without-appendices.pdf.

[6] Erik Borgen, *et al*., Desert Research Institute, Ecosystem Economics, Desert Research Institute, A SIMULATION MODEL FOR EVALUATING WATER ACQUISITIONS TO REDUCE TOTAL DISSOLVED SOLIDS IN WALKER LAKE 6 (2014), http://goo.gl/CWgQRg (indicating TDS levels of 21,800 mg/L in Walker Lake in January 2014).

vanished.  With the death of its aquatic life, migratory birds have begun to abandon the Lake.  Even the midges, side swimmers, and damselflies have disappeared from the Lake on a search for a more hospitable habitat.[7]  A scum now lines the Lake's receding shores.

B.  *The Decree and River Administration*

The action before us was filed in 1924, but traces its history even further back, to 1902, when two cattle kings realized that the Walker River Basin wasn't big enough for the two of them.  Miller & Lux, the sprawling ranching enterprise owned by Henry Miller, the "Cattle King of California," filed a quiet title action in Nevada district court against 150 defendants, including arch-rival Rickey Land & Cattle Co. owned by Thomas Rickey, the "Cattle King of the West."  Miller & Lux sought a declaration of appropriative water rights to a flow of 943.29 cubic-feet per second (cfs) of the Walker River for use on its Nevada lands.  *Miller & Lux v. Rickey*, 127 F. 573, 575–76 (C.C.D. Nev. 1902).  Rickey in turn sued Miller in California state court, seeking his own appropriative rights to a flow of 2,079 cfs for use on his California lands.  For years the parties disputed the Nevada district court's jurisdiction over California water rights, pleading deficiencies, and application of the now-extinct local action doctrine.

The Nevada district court granted an antisuit injunction in Miller's favor, and we affirmed.  *Rickey Land & Cattle Co. v. Miller & Lux*, 152 F. 11, 22 (9th Cir. 1907).  Because any given usufructory right to a flow has an inherent connection

---

[7] U.S. Fish & Wildlife Service, *Walker Lake Ecosystem: Research and Monitoring Summary Report 2006–2013* (2013).

to all other such rights in the same stream, appropriative rights are conclusively established only by reference to all other competing rights.  We held that this naturally requires exclusive jurisdiction over the entire res of the Walker River. *Id.* at 14–19.  The Supreme Court agreed.  *Rickey Land & Cattle Co. v. Miller & Lux*, 218 U.S. 258 (1910) (Holmes, J.). After a decade of factfinding and hearings, the district court issued a final decree settling the rights to the River.  *Pac. Livestock Co. v. Thomas Rickey*, In Equity No. 731, Final Decree (D. Nev. 1919) ("the Rickey Decree").  Under the Rickey Decree, the district court retained ancillary jurisdiction to resolve future disputes over rights to Walker River.

The Walker River Irrigation District ("WRID") was established in 1919.  It built two reservoirs in 1919 and 1921: Topaz on the West Walker River, and Bridgeport on the East Walker River.[8]  In 1924 the United States filed an action—In Equity No. C-125—to quiet title to water rights to the Walker River as trustee for the Tribe.  After another decade of service of process, the appointment of two Special Masters, factfinding, and hearings, the court issued a final Decree on April 14, 1936, amended in 1940 in ways not relevant here.

Article I of the Decree recognizes the implied reserved rights of the United States as trustee to the Tribe.  *See Winters v. United States*, 207 U.S. 564, 576–78 (1908).  Article II recognizes in their entirety the rights established in the 1919 Rickey Decree.  Articles III–VII and IX provide for the flow and storage rights of new private parties.  Article VIII recognizes WRID's storage rights in the Topaz and

---

[8] *See* NEV. REV. STAT. 539.013(2); James H. Davenport, NEVADA WATER LAW 34 (2009).

Bridgeport reservoirs with respective priority dates of 1919 and 1921, and the attendant authority to distribute the water stored there.  Article X permits rightsholders to change the manner, means, place or purpose of use, or the point of diversion in the manner provided by law "so far as they may do so without injury to the rights of other parties hereto, as the same are fixed hereby."  Articles XI–XII provide that no party may relitigate a claim to water rights in the Walker River Basin, in the Nevada District Court or any other court, that was litigated in the original case as of April 14, 1936.  Article XIII permits rightsholders to rotate their use of water, i.e., collectively or individually rotate water usage for improved efficiency, so long as no other rights are thereby injured.  Article XIV establishes the district court's continued jurisdiction "for the purpose of changing the duty of water or for correcting or modifying this decree; also for regulatory purposes, including a change of the place of use of any water user," but stipulates that "no water shall be sold or delivered outside of the basin of the Walker River . . . ."  Article XV permits the Decree court to designate a water master, which it did in 1937 by creating the U.S. Board of Water Commissioners ("the Water Commissioners")—a six-member board overseen by a Water Master who apportions and distributes the River's waters.  Finally, Article XVI sets the irrigation season, which is today set at March 1 to October 31.  By establishing its continued jurisdiction over the action and the river, the district court became the "Decree court."

C.  *The Walker Basin Restoration Program*

In 2002, Congress began to allocate funds for desert terminal lake conservation.  In 2009, it established the Walker Basin Restoration Program "for the primary purpose of restoring and maintaining Walker Lake."  Pub.  L. No. 111-

85, §§ 207–08, 123 Stat. 2845, 2858–60 (2009); 16 U.S.C. § 3839bb-6.  The Program is designed as a voluntary water rights acquisition, trading, and leasing scheme to be jointly administered by NFWF and WRID.  Under the program, NFWF leases or purchases flow and storage rights from willing sellers, and uses those rights to convey water downstream to feed the Lake.  NFWF negotiated the program details with the Tribe and WRID.  WRID thereafter adopted a regulation permitting rightsholders along the River to participate in the program by leasing their claims for in-stream use.

NFWF purchased a number of claims with priority dates from 1874 to 1906, which cumulatively provide for 7.745 cfs.[9]  In an effort to avoid injury to other rightsholders, NFWF entered into stipulations with WRID, Lyon County, the Tribe, the U.S. Department of the Interior Bureau of Indian Affairs, and several private rightsholders.  Per these stipulations, NFWF agreed that program water would be limited to the consumptive use portion of its decreed claims: 4.122 cfs out of 7.745 cfs.

The consumptive use portion of a water right reflects the amount of water that is actually used and consumed by agriculture.  When an upstream user appropriates water for irrigation, some portion of the water—the non-consumptive use portion—is not consumed by the crop and returns as runoff to the river, and for another rightsholder's use downstream.  For example, if Farmer A calls for a constant flow of 10 cfs, some variable non-consumptive portion returns to the river, say 4 cfs; the difference (6 cfs) is Farmer

---

[9] These claims are identified as Decree Claims No. 23, 23-A, 35, 44, 67, and 89.

A's consumptive use portion.  The 4 cfs that returns to the river is then available for Farmer B's use.  Effectively, Farmer A has the right to call for 10 cfs, but is consuming only 6 cfs.  The consumptive and non-consumptive use portions of any given water right will vary depending on crop type, volume of irrigation water, and environmental factors. In this example, if Farmer A seeks to change the claim's use by removing the entirety of the 10 cfs from the river, Farmer B's right is injured through deprivation of the non-consumptive 4 cfs runoff.  Determining whether a change to Farmer A's use will injure Farmer B's right thus requires determining how the change will affect the disposition of the non-consumptive portion of Farmer A's water right.

Here, NFWF acquired the rights to call for 7.745 cfs. NFWF's hydrologists calculated a historic consumptive use portion at a flow rate of 4.122 cfs.  The difference, 3.623 cfs, is the river runoff that was historically available to downstream rightsholders.  So as not to injure these downstream claims, NFWF stipulated that it would call for program water only in the flow amount of 4.122 cfs over the course of the irrigation season, that is, approximately 53 percent of its total appropriative rights to 7.745 cfs. NFWF further stipulated that the non-consumptive use portion of its claims—a flow of 3.623 cfs—would be administered by the Water Commissioners "in [their] discretion . . . to avoid conflict with and injury to existing water rights . . . and to mitigate hydrologic system losses."

D.  *State Agency Rulings*

Under Article X of the Decree, as well as the 1953 Rules and Regulations and the 1996 Administrative Rules and Regulations, both of which were approved by the Decree

court, change applications—meaning any proposed changes in purpose or place of use—must first be presented to the state agencies for their approval.[10]  Applicants with Nevada water rights submit applications with the Nevada State Engineer, and applicants with California water rights submit applications to the California State Water Resources Control Board ("the California Control Board").[11]

### 1. The Nevada Ruling

In 2011, NFWF applied with the Nevada State Engineer for approval of two changes to its claims to a cumulative 7.745 cfs.  First, NFWF requested changing the place of use to "within the Walker River from the Weir Diversion Structure through the USGS Wabuska Gauge, then through Weber Reservoir into and including Walker Lake."  The previous rightsholders had diverted the flow from the Weir Diversion Structure into the West Hyland Ditch, downstream

---

[10] *See* Administrative Rules & Regulations Regarding Change of Point of Diversion, Manner of Use or Place of Use of Water of the Walker River and its Tributaries and Regarding Compliance with California Fish and Game Code Section 5937 and Other Provisions of California Law (as amended through June 3, 1996) ("1996 Adminstrative Rules & Regulations").

[11] The California Control Board has permitting and licensing authority only over water rights established after 1914, when the Board was created. *Cal. Farm Bureau Fed'n v. State Water Res. Control Bd.*, 247 P.3d 112, 117–18 (Cal. 2011).  In some circumstances the California Control Board may approve a petition for change in point of diversion, place of use, or purpose of use under riparian or pre-1914 appropriative rights. *See*, *e.g.*, *id.* at 117–20; CAL. WATER CODE § 1707.  In 1990, the Decree court appointed the Board as a Special Master, thus authorizing the Board to make findings and recommendations as to pre-1914 claims. *See* Fed. R. Civ. P. 53(b).

from Yerington.  Second, NFWF requested changing the purpose of use from irrigation to wildlife purposes. *See* NEV. REV. STAT. § 533.023.  Effectively, NFWF sought approval not to remove the water obtained through exercise of its water rights, so that water acquired from prior rightsholders may flow, as it naturally would, into Walker Lake.  Appropriative rights in Nevada may be applied for a beneficial use in-stream, regardless of whether the water flows to areas not owned by the rightsholder.  NEV. REV. STAT. § 533.040(2); *State Bd. of Agric. v. Morros*, 104 Nev. 706, 766 (1988).

The Water Commissioners and a group of private parties ("the Farmers") objected to both change applications.  The objecting Farmers hold so-called New Land Stored Water Rights.  That is, they operate farms on acres lacking associated decreed claims, and instead have contractual arrangements with WRID.  They pay assessments to WRID, which provides them with surplus reservoir water from Topaz and Bridgeport.  In other words, these are nondecreed rights to reservoir water, not appropriative flow or storage rights.

The Water Commissioners and Farmers pressed two arguments.  First, they argued that the changes would impermissibly injure their New Land Stored Water Rights. NFWF expects to call continuously for water during the irrigation season when in priority, whereas the farmers who previously owned the claims would on certain days occasionally not call for water, such as on harvesting days, which permitted the flow claims to be redirected by the Water Master for reservoir storage.  As such, the Farmers argued that a continuous call would impermissibly injure their rights, because it would ultimately decrease the amount of reservoir water later available to meet their irrigation needs.  Second, they argued that Walker Lake lies outside of the Walker River

Basin. Thus, directing water to the Lake would violate Article XIV of the Decree: "[N]o water shall be sold or delivered outside of the basin of the Walker River."

The Nevada State Engineer, following public hearings, rejected both arguments and granted NFWF's application. With respect to the question of injury, the Nevada State Engineer found that under NFWF's consumptive use stipulation, no party would suffer injury. The State Engineer considered NFWF in the position of "an irrigator who has a decreed right to call for water on March 1st for the duration of the irrigation season," and "as the holder of claims senior in priority to new lands storage rights, [NFWF] has the right to seek a change in the manner and place of use." The State Engineer rejected any possibility that injury could occur under NFWF's stipulations, because it had dedicated the non-consumptive portion of its decreed rights to the Water Commissioners to remedy any injury or hydrological efficiency loss caused by a continuous call of the consumptive use portion of its decreed appropriative rights. The State Engineer's ruling adopted and incorporated the consumptive use stipulations in their entirety. Finally, the Engineer concluded that "Walker Lake is included in the Walker River basin."

### 2. The California Ruling

Likewise, WRID applied to the California Control Board to temporarily change the place and purpose of use of its decreed storage rights for Topaz and Bridgeport. This change would allow WRID to distribute 25,000 acre-feet of stored water per season to Walker Lake to meet the in-stream water calls made by rightsholders within WRID who participate in the program. The temporary changes were intended to give

WRID the time and flexibility to run the program for a trial season while preparing its application for permanent changes.

The California Control Board reviewed WRID's temporary one-year change application under California Water Code § 1727.  As relevant here, a party applying for a temporary change must show that:

> [t]he proposed temporary change would not injure any legal user of the water, during any potential hydrologic condition that the board determines is likely to occur during the proposed change, through significant changes in water quantity, water quality, timing of diversion or use, consumptive use of the water, or reduction in return flows.

CAL. WATER CODE § 1727(b).  *See also* CAL. WATER CODE §1707(b)(2) (changes may not "unreasonably affect any legal user of water").

The California Control Board overruled the objections of the Water Commissioners and the Farmers.  It found that WRID had carried its burden because "petitioners do not request any changes in the diversion of water to storage; instead they only request changes in the place and purpose of use upon release from storage."  By contrast, the Water Commissioners and Farmers had failed to demonstrate "any right, under contract or otherwise, to the stored water that will be injured by the proposed temporary change."  As the California Control Board explained, under California law, changes to the purpose or place for which WRID releases reservoir water under its control cannot give rise to an injury, because WRID—not the Farmers—holds the statutory and

decreed right to distribute this water to legal appropriative users.  *See Stevens v. Oakdale Irrigation Dist.*, 90 P.2d 58, 60–61 (Cal. 1939) (noting that a downstream user has no right to a continued release of artificial flow).  Accordingly, the California Control Board concluded:

> It is not enough for a water user to show that it will receive less water as a result of the change.  Instead, a water user claiming injury must demonstrate that it has a right to the greater amount of water claimed and that the proposed change will interfere with that right. . . .  None of the commenters have demonstrated any right, under contract or otherwise, to the stored water that will be injured by the proposed temporary change.

Like the Nevada State Engineer, the California Control Board rejected the argument that Walker Lake is not part of the Walker River Basin, noting that the Lake sits within the same hydrological drainage basin as the River.

On motion for reconsideration, the California Control Board affirmed its decision with an amendment noting that "a stored water transfer . . . is not limited to the consumptive use portion of the water right," because "a downstream water user who does not have a right to stored water cannot be injured by changes in releases of the stored water."  *See* CAL. WATER CODE § 1725 (permitting transfers of amounts that have been "consumptively used or stored").

E.  *Decree Court Ruling*

The Decree court rejected the Nevada State Engineer's and California Control Board's rulings, refused to grant the change applications, and remanded to the state agencies. First, the court found that the stipulated program water quantity would injure New Land Stored Water Rights, because NFWF would not mimic the historical consumptive use watering patterns of prior users who had occasionally suspended calls for water on harvesting days.  The court reasoned that even if NFWF was

> limited to the historical use amount at any given time, it is likely to call for that amount on every day during the irrigation season, whereas its predecessors-in-interest did not in practice call for water during harvests and certain other periods, so the overall effect of the change will likely be to reduce the amount of water available for storage.

The Decree court found that, although NFWF had properly limited program water to the consumptive use portion of its flow on a *per second* basis, NFWF would continuously call for its claims to be serviced, and thus would consume more water *per season* as compared to its predecessors-in-interest.  The court explained:

> A limit on the rate of consumption per second during days of use does not suffice to satisfy the no injury rule if the total amount of consumption per year is nevertheless increased.  Where NFWF will in practice consume water at the same rate as its

predecessors-in-interest but on more days throughout the year, its greater number of days of consumption per year could result in increased consumption per year (and therefore less available storage water available for junior users). . . . [T]he no injury rule prohibits NFWF from consuming more water per second *or* per year than its predecessors-in-interest.

The court remanded to the Nevada State Engineer to determine the average number of days per year that each of NFWF's predecessors-in-interest historically called on their respective claims and to limit approval of the change application accordingly.

As to the California Control Board's ruling concerning changes to WRID's storage rights, the Decree court found that changes to such rights must also be limited to the consumptive use portion of the rights.  In this regard, the court held that the Farmers' rights are injured where a change application effectively reduces the amount of stored water available to the users of those stored water rights.  The California Control Board had determined that because the amount of storage water in the change would be limited to water that would have otherwise been consumed or stored by WRID, no injury would occur.  The Decree court rejected this finding, and remanded for the same historical consumptive use calculations it had required with regard to the Nevada State Engineer's ruling.  Specifically, the Decree court set out a four-part procedure requiring the California Control Board to: (1) identify each separate "piece" of program water temporarily sold to WRID; (2) multiply those pieces by the respective portions of those pieces historically attributable to

consumptive use; (3) calculate the sum of the consumptive use pieces; and (4) limit the change applications accordingly.

The Decree court also rejected both the Nevada and California change applications on the grounds that in-stream delivery of program water to Walker Lake would violate the Decree's export restriction, which prohibits delivering water "outside of the basin of the Walker River." The court found that the "basin" comprises only agricultural lands and waters named in the Decree. The court concluded, however, that despite this, NFWF could still effectively send water to the Lake by simply sending it to the most terminal point of the River.

These appeals followed. Appellants are NFWF, WRID, the Nevada State Engineer, the Nevada Department of Wildlife, Mineral County, and the Walker Lake Working Group. Appellees are the Water Commissioners and the Farmers. The United States and the California Control Board appear as *amici*.

## II.  JURISDICTION, CHOICE OF LAW, AND STANDARD OF REVIEW

A.  *Jurisdiction*

The Water Commissioners argue that, because the Decree court merely remanded the change applications, did not fully adjudicate the issues, and did not intend that its order be its final act in the matter, we lack jurisdiction under 28 U.S.C. § 1291. Remand orders do not generally constitute appealable "final decisions" under 28 U.S.C. § 1291. *Alsea Valley All. v. Dep't of Commerce*, 358 F.3d 1181, 1184 (9th

Cir. 2004); *see also Dig. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994).

But a remand order may be considered final where "(1) the district court conclusively resolves a separable legal issue, (2) the remand order forces the agency to apply a potentially erroneous rule which may result in a wasted proceeding, and (3) review would, as a practical matter, be foreclosed if an immediate appeal were unavailable." *Collord v. U.S. Dep't of the Interior*, 154 F.3d 933, 935 (9th Cir. 1998). These are not "strict prerequisites," but merely "considerations." *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1175 (9th Cir. 2011).

As to the first *Collord* consideration, the district court resolved both questions at issue here: whether an injury can accrue on these facts under the Walker River Decree, and whether Walker Lake is "outside of the basin." As to the second *Collord* consideration, the Nevada State Engineer and the California Control Board would be compelled to apply the district court's injury standard, which could as a practical matter upset property rights elsewhere in the Walker River Basin. The State Engineer explains that such a remand would involve "a wasted proceeding [and] an unnecessary burden to the State of Nevada's resources, and force the [ ] Engineer to apply the district court's erroneous interpretation of Nevada water law." The State Engineer's concerns are credible: the remand order calls for a type of historical calculation that would possibly require developing new methodologies for measuring consumptive use. The third *Collord* consideration is met where the agency is a party to the appeal. *Alsea*, 358 F.3d at 1184 (9th Cir. 2004). Otherwise, agencies "face the unique prospect of being deprived of review altogether." *Id.* The third consideration is met here, as the Nevada State

Engineer appears as a party in these proceedings as Respondent-Appellant.  Although the California Control Board is not a party to this appeal, it appears here as an *amicus* and has fully briefed the issues.

Beyond the *Collord* test, remand orders are sufficiently "final" under § 1291, where the relief sought by appellants cannot possibly be achieved through the district court's directions.  *Sierra Forest*, 646 F.3d at 1174.  Such "meaningless remand[s]" are anathema to judicial economy. *Skagit Cty. Pub. Hosp. Dist. No. 2 v. Shalala*, 80 F.3d 379, 384 (9th Cir. 1996).  In the absence of appellate review, the Nevada State Engineer and California Control Board may be unable to grant any change applications that request delivering water to Walker Lake, which the district court held to be outside of the basin.

The remand order is sufficiently final for our review under 28 U.S.C. § 1291.

## B.  *Choice of Law*

The Water Commissioners ask us to apply federal water law.  But there is no federal water law.  Fundamental principles of federalism vest control of water rights in the states. *See California v. United States*, 438 U.S. 645, 677–79 (1978); *United States v. Alpine Land & Reservoir Co.*, 503 F.Supp 877, 885 (D. Nev. 1980).  Decreed rights are administered under applicable state law. *See United States v. Walker River Irrigation Dist.*, 11 F.Supp. 158, 165–68 (D. Nev. 1935) ("The rights of the government, in its use of the waters of the Walker river and its tributaries for purposes of irrigation, like the rights of all other diverters in the Walker River basin, are to be adjudged, measured, and administered

in accordance with the laws of appropriation as established by the state of Nevada."); *see also Montana v. Wyoming*, 563 U.S. 386, 377 n.5, 378 (2011); *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 163–64 n.2 (1935); *United States v. Alpine Land & Reservoir Co.*, 697 F.2d 851, 858 (9th Cir. 1983) ("[S]tate law will control the distribution of water rights to the extent that there is no preempting federal directive."). Under the Decree, change applications are to be treated "in the manner provided by law." The Decree presupposes state law in its entirety as to both substance and procedure. *See United States v. Orr Water Ditch Co.*, 914 F.2d 1302, 1307–08 (9th Cir. 1990).

## C. *Standard of Review*

### 1. Review of the Decree Court

We review the Decree court's legal conclusions and interpretations of the Decree de novo. *United States v. Orr Water Ditch Co.*, 256 F.3d 935, 945 (9th Cir. 2001); *Orr Water Ditch*, 914 F.2d at 1307. Our review of mixed questions of law and fact depends on the nature of the issue. "A mixed question asks whether 'the historical facts . . . satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.'" *U.S. Bank Nat'l Ass'n v. Village at Lakeridge, LLC*, 583 U.S. ____ (2018) (slip op., at 7) (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289, n. 19 (1982)). "When an 'issue falls somewhere between a pristine legal standard and a simple historical fact,' the standard of review often reflects which 'judicial actor is better positioned' to make the decision." *Id.*, slip op. at 8 (quoting *Miller v. Fenton*, 474 U.S. 104, 114 (1985)). In reviewing change application to water rights, the Decree court's

activities are primarily legal—the evidence and facts underlying the change applications are elicited and marshaled in proceedings before the respective state agencies. The Decree court then reviews those agencies' rulings with at least some deference to questions of fact and law, as discussed below. We will review de novo the Decree court's review of the state agencies. Where the Decree court has entered its own findings of fact, we review those for clear error.

### 2.   Deference to State Agencies

The parties dispute whether and to what degree the Decree court was required to defer to the state agency findings and rulings in their adjudication of change applications. As we have previously explained, the Decree court applies state water law. When it does so, the Decree court must afford the same level of deference state courts would afford the state agencies. *See Orr Water Ditch*, 914 F.2d at 1307–08.

Under Nevada law, the "decision of the State Engineer is prima facie correct, and the burden of proof is upon the party attacking the decision." NEV. REV. STAT. § 533.450(10); *see State Eng'r v. Morris*, 819 P.2d 203, 205 (Nev. 1991) ("[D]ecisions of the State Engineer are presumed to be correct upon judicial review."). With respect to findings of fact, the Nevada Supreme Court has stated that "neither the district court nor this court will substitute its judgment for that of the State Engineer: we will not pass upon the credibility of the witnesses nor reweigh the evidence, but limit ourselves to a determination of whether substantial evidence in the record supports the State Engineer's decision." *Id.* (citation omitted). As to matters of law, the

State Engineer's interpretation of legal questions and Nevada statutes is "persuasive," but not controlling. *Orr Water Ditch*, 256 F.3d at 945; *State v. Morros*, 766 P.2d 263, 266 (Nev. 1988).

California courts also exercise deferential review and must consider:

> (1) whether the [Board] has proceeded without, or in excess of jurisdiction; (2) whether there was a fair trial; and (3) whether there was any prejudicial abuse of discretion.  Abuse of discretion is established if the [Board] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.

CAL. CIV. PROC. CODE § 1094.5(b); *see State Water Res. Control Bd. Cases*, 39 Cal. Rptr. 3d 189, 226 (Cal. Ct. App. 2006).  A court "review[s] the record to determine whether the [Board's] factual findings are supported by substantial evidence, resolving all evidentiary conflicts and drawing all legitimate and reasonable inferences in favor of the [Board's] decision." *Millview Cty. Water Dist. v. State Water Res. Control Bd.*, 177 Cal. Rptr. 3d 735, 746 (Cal. Ct. App. 2014) (citation omitted).  Like Nevada courts, California courts review the Board's *legal* conclusions independently, "giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action." *Phelps v. State Water Res. Control Bd.*, 68 Cal. Rptr. 3d 350, 360 (Cal. Ct. App. 2007) (emphasis in original) (citation omitted).

The Farmers and Water Commissioners argue that because the Decree court appointed the California Control Board as Special Master under FED. R. CIV. P. 53(b) in 1990, the Decree court may review all aspects of the Board's rulings de novo and that the Decree court's 1996 Adminstrative Rules and Regulations so provide. *See* FED. R. CIV. P. 53(f)(3)–(4); 1996 Administrative Rules & Regulations § 7.9; *see also id.* § 7.10 ("In reviewing any report of the Water Resources Control Board, the court . . . shall not be limited by the 'clearly erroneous' standard."). As we have previously explained, *supra* note 11, the Decree court appointed the California Control Board as a Special Master over pre-1914 appropriative rights, over which the Board lacks permitting and licensing authority. WRID's storage rights did not arise until the construction of the reservoirs in 1919 and 1921, and thus the California Control Board had authority to rule on WRID's change applications. Here, the Board issued its Order and Modified Order in its role as state agency and submitted a report to the Decree court in its role as Special Master. Insofar as the California Control Board exercised lawful agency authority under California law in adjudicating change applications to WRID's post-1914 water rights, the Decree court should have afforded the Board the same degree of deference that California courts do.[12]

## III.  ANALYSIS

Appellants claim two errors. First, they argue that NFWF's promise to limit its in-stream use to the historic

---

[12] On remand, the Decree court may wish to consider whether the 1996 Administrative Rules and Regulations need to be clarified to conform to this opinion and to Nevada and California law.

consumptive use portion of its claims precludes any possibility of injury to other rightsholders. Second, they argue that the court erred by interpreting the Decree's export restriction as a prohibition on delivering water to the Lake. We address each in turn.

A. *Injury*

Article X of the Decree states:

> Any of the said parties shall be entitled to change the manner, means, place or purpose of use or the point of diversion of the said waters or any thereof in the manner provided by law, so far as they may do so without injury to the rights of other parties hereto, as the same are fixed hereby.

This "no-injury" provision in the Decree recognizes the duty of each appropriator to manage its water use so as to avoid injury to other appropriators, including junior appropriators. The Nevada State Engineer and the California Control Board both concluded that because NFWF agreed to limit program water to the consumptive use portion of the claims, there is no material change in its usage and no other rightsholders will be injured. The Decree court rejected this conclusion. We conclude that the Decree court failed to defer to the findings and conclusions of the state agencies. To the extent the Decree court entered its own findings, we conclude that those findings are clear error.

1.  Principles

Almost all states employ one of three water rights regimes: a regime of riparian rights common in the East, a regime of rights acquired by prior appropriation common in the West, or a hybrid system such as in California.  While riparian rights inhere in the land appurtenant to the waterway, vary in quantity based on flow, remain vested even if unused, and are subject to reasonable use, appropriative rights are untethered from land ownership, are acquired and maintained by active beneficial diversion of water, provide for a fixed flow of water, and are tiered as senior and junior rights based on chronological claim priority.  As the Supreme Court explained,

> The right to water by prior appropriation . . . is limited in every case, in quantity and quality, by the uses for which the appropriation is made. . . .  The appropriation does not confer such an absolute right to the body of the water diverted that the owner can allow it, after its diversion, to run to waste and prevent others from using it for mining or other legitimate purposes.
>
> . . .
>
> What diminution of quantity . . . will constitute an invasion of the rights of the first appropriator will depend upon the special circumstances of each case, considered with reference to the uses to which the water is applied.

*Atchison v. Peterson*, 87 U.S. 507, 514–15 (1874).  *See also Colorado v. New Mexico*, 459 U.S. 176, 179 n.4 (1982).

In Nevada, as elsewhere, a water right is the "right to divert water . . . for beneficial use from a natural spring or stream." *Application of Filippini*, 202 P.2d 535, 537 (Nev. 1949).  Perfecting and maintaining appropriative water rights require an act of diversion—or, as here, an act of so-called non-diversion—and beneficial use of the water.  *See*, *e.g.*, *Prosole v. Steamboat Canal Co.*, 140 P. 720, 722 (Nev. 1914) (superseded by statute on other grounds); *Strait v. Brown*, 16 Nev. 317, 324 (1881); *Lobdell v. Simpson*, 2 Nev. 274, 279 (1866); *see also Nebraska v. Wyoming*, 325 U.S. 589, 614 (1945) ("The water right is acquired by perfecting an appropriation, i.e., by an actual diversion followed by an application within a reasonable time of the water to a beneficial use.").  As with senior and subordinated debt, a senior appropriative right, i.e., the right with an earlier priority date, is superior to all junior rights.  When there is insufficient water to fill all claims, the senior right is satisfied before others.  DAVID H. GETCHES, WATER LAW 77–80 (4th ed. 2009).

The no-injury rule of Article X of the Decree is a codification of a basic principle of prior appropriation:

> [T]he no-injury rule prevents appropriators from making certain water-right changes that would harm other appropriators . . . .  Because each new appropriator is entitled to the stream as it exists when he finds it, the general rule is that "if a change in these conditions is made by [a senior] appropriator, which interferes with the flow of the water to the material

> injury of [the junior appropriator's] rights, he
> may justly complain."

*Montana*, 563 U.S. at 378 (alterations in original) (quoting 2 C. Kinney, LAW OF IRRIGATION AND WATER RIGHTS § 803, at 1404 (2d ed. 1912)); *see also Wyoming v. Colorado*, 298 U.S. 573, 584 (1936) ("[T]he use of the water may be changed from the irrigation of one tract to the irrigation of another, if the change does not injure other appropriators."). Alleged injuries are analyzed on a case-by-case basis with a primary focus on the particular equities at issue. *Atchison*, 87 U.S. at 514–15.

Nevada has codified its no-injury rule. NEV. REV. STAT. § 533.370 (requiring an injury analysis in change application adjudications to determine whether "the proposed use or change conflicts with [other] existing water rights" and prohibiting changes that will "adversely affect the cost of water for other holders of water rights in the district"). In determining whether a proposed change application causes injury,

> [t]he State Engineer may consider the
> consumptive use of a water right and the
> consumptive use of a proposed beneficial use
> of water in determining whether a proposed
> change in the place of diversion, manner of
> use or place of use [causes injury]. The
> provisions of this section [m]ust not be
> applied by the State Engineer in a manner that
> is inconsistent with any applicable federal or
> state decree concerning consumptive use.

NEV. REV. STAT. § 533.3703(1)*.  Cf. Pyramid Lake Paiute Tribe of Indians v. Nev. Dep't of Wildlife*, 724 F.3d 1181, 1185 n.4 (9th Cir. 2013) ("[C]hange in manner of use applications from use for irrigation to any other use . . . shall be allowed only for the net consumptive use of the water as determined by this Decree.") (quoting Administrative Provision VII of Alpine Decree).[13]

California law similarly recognizes the no-injury rule and takes into account the effect of consumptive use.  The California Control Board "shall approve a temporary change if it determines that a preponderance of the evidence shows" that the "proposed temporary change would not injure any legal user of the water" or "unreasonably affect fish, wildlife, or other instream beneficial uses."  CAL. WATER CODE § 1727(b); *see also* CAL. WATER CODE § 1726(e) ("[T]he

---

[13] The Orr Ditch decree court's definition of injury is also consistent with these principles:

> An "injury" to a Decreed water right is not shown merely by establishing a shortage of water because an owner of a water right can be shorted water without violating the Orr Ditch Decree.  Similarly, alterations of historical flows do not, of themselves, establish injury.  Rather, an injury occurs when the owner receives less water than the amount to which the owner is legally entitled, which determination requires consideration not only of the amount of the water duty, but also its priority, and certain other conditions affecting the river system.

*Orr Water Ditch*, 2014 WL 4832052, at *7 (D. Nev. Sept. 30, 2014); *see also United States v. Gila Valley Irrigation Dist.*, 859 F.3d 789, 801 (9th Cir. 2017) ("Possible injury should be analyzed by comparing the impact of a proposed change against a baseline of existing conditions.") (citation and quotation omitted).

proposed change must involve only the amount of water that would have been consumptively used or stored in the absence of the temporary change."). "[I]n determining whether the petitioned changes to the licenses of the irrigation districts would cause 'substantial injury' to or would 'unreasonably affect' riparian and appropriative users in the [water at issue]," the California Control Board should focus "on the effect of those changes on the *rights* of those users." *State Water Res. Control Bd. Cases*, 39 Cal. Rptr. 3d at 243. "[A] person who claims injury from a change in the terms of a permit to appropriate water must show the change will interfere with his or her *right* to use the water, whatever the source of that right may be." *Id*. at 293. California law protects the continuation of a river's natural flow against a change in use by another appropriator, but does not assure the release of stored water, as such water constitutes an artificial supply and flow. *Stevens*, 90 P.2d at 60–61; *see also State Water Res. Control Bd. Cases*, 39 Cal. Rptr. 3d at 238–46.

As we have previously explained, when water is withdrawn from a river system for irrigation, some of that water will return to the system through drainage. The consumptive use portion of a water right reflects the amount of water that a farmer's crops actually consume.[14] The rest of the water, the non-consumptive use portion, drains as runoff to the river or otherwise remains in the basin's hydroecosystem for subsequent use by downstream users. *See Alpine Land & Reservoir Co.*, 697 F.2d at 857 n.4.

---

[14] The U.S. Geological Survey (USGS) defines consumptive use as "the part of water withdrawn that is evaporated, transpired, incorporated into products or crops, consumed by humans or livestock, or otherwise not available for immediate use." USGS, WATER USE TERMINOLOGY, https://water.usgs.gov/watuse/wuglossary.html.

Consumptive use is not a measure of how farmers call for water, but rather the "quantity of water actually consumed by crop growth." *Pyramid Lake Paiute Tribe of Indians*, 724 F.3d at 1185. When rightsholders change the purpose or place of use of a water right, they must consider how that change will affect fellow appropriators. Suddenly drawing more water from the river for a new and unannounced purpose can diminish one's downstream neighbor's rights to the runoff. The nonconsumptive portion of an appropriation must be considered, because a junior rightsholder "is entitled to the stream as it exists when he finds it." *Montana*, 563 U.S. at 378 (quoting 2 KINNEY § 803, at 1404); *see* GETCHES, WATER LAW at 178.

2. Application

When NFWF acquired decreed appropriative rights with priorities from 1874 to 1906, it acquired the right to a flow of 7.745 cfs. But NFWF's prior appropriators did not consume all 7.745 cfs. Their consumptive use was only 4.122 cfs, the remaining 3.623 cfs finding its way back to the Walker River as runoff. NFWF agreed, consistent with the historic use of the prior rightsholders, to divide its right into a consumptive use portion of 4.122 cfs to be used as program water, and the remaining non-consumptive use portion of 3.623 cfs to be used to mitigate hydrological system loss.

The Nevada State Engineer and the California Control Board approved NFWF's and WRID's proposed change applications, but the Decree court refused to approve the changes. According to the court, NFWF's changes would "injure other users with decreed rights." The court acknowledged that NFWF would take only "the former consumptive use amount," but found that NFWF was "likely

to call for that amount on every day during the irrigation season, whereas its predecessors-in-interest did not in practice call for water during harvests and certain other periods."   Specifically, the court was referring to the historical harvest days identified in the evidence submitted to the Nevada State Engineer, indicating a total of four alfalfa harvest days in the Mason Valley beginning around June 3 each year.  In the Decree court's view, because "the no injury rule prohibits NFWF from consuming more water per second *or* per year than its predecessors-in-interest did," "the overall effect of the change will likely be to reduce the amount of water available for storage."   The Decree court was concerned that, although NFWF's *flow rate* was consistent with historic usage, the *total* amount of water to be taken by NFWF would exceed the water historically called for by its predecessors-in-interest:

> The Court finds that under the no injury rule, the changes must be limited not only to the prior consumptive use per second, but also to the prior total amount of consumptive use per year.  A limit on the rate of consumption per second during days of use does not suffice to satisfy the no injury rule if the total amount of consumption per year is nevertheless increased.  Where NFWF will in practice consume water at the same rate as its predecessors-in-interest but on more days throughout the years, its greater number of days of consumption per year results in increased consumption per year (and therefore less available storage water available for junior users).

Water can be calculated as a flow or as a volume. Appropriative flow rights under the Decree are calculated in cubic-feet per second (cfs), while annual consumptive use is calculated as a volume in acre-feet per acre per irrigation season (afa). *See* BECK & KELLEY, 1-1 WATERS AND WATER RIGHTS § 1.02 (2017). The Net Irrigation Water Requirement (NIWR) of alfalfa in the Mason Valley is 3.1 afa. *See* J.L. Huntington & R.G. Allen, Nevada Department of Conservation & Natural Resources, EVAPOTRANSPIRATION AND NET IRRIGATION WATER REQUIREMENTS FOR NEVADA 215 (2010) ("NIWR Report"). The NIWR is synonymous with consumptive use per year. This figure means that over the course of an irrigation season, one acre of alfalfa in the Mason Valley will consume 3.1 acre-feet of irrigation water—anything beyond that is runoff.[15]

NFWF's stipulations contained three provisions pertinent here. First, NFWF stipulated to an annual consumptive use volume of 3.1 acre-feet of water per acre (afa), which is the total consumptive requirement for an acre of alfalfa, the crop grown by NFWF's predecessors-in-interest. Second, out of NFWF's total rights to 7.745 cfs, only 4.122 cfs—the consumptive use portion of the flow—would be used as program water. Third, the remaining portion of its rights—the non-consumptive use portion of 3.623 cfs—would be at the Water Commissioners' disposal

---

[15] The NIWR of 3.1 for alfalfa in the Mason Valley was calculated using evapotranspiration parameters such as crop height, radiation, soil heat flux densities, temperatures, wind speeds, saturation vapor pressures, pressure-temperature curves, precipitation, other atmospheric and psychrometric variables, as well as simulated green-ups and harvest cuttings. NIWR Report at 3–9, 27, 44–50. The NIWR of 3.1 afa was derived from mean evapotranspiration values from 1965–2007. *Id.* at 68, 215.

to mitigate any possible injury to other water rights, including the storage rights belonging to WRID.

The Nevada State Engineer received testimony on the consumptive use as measured per second (cfs) and annually (afa). And, specifically, that testimony addressed whether NFWF's proposed use accounted for the harvest days of its predecessors-in-interest. The Nevada State Engineer credited the testimony of hydrologist Dr. Greg Pohll, who stated that the 3.1 afa in the NIWR included both "variable start dates for irrigation in Mason and Smith Valleys, and individual simulated cuttings as part of the calculations." Similarly, the Engineer heard from David Yardis, Director of the Walker Basin Restoration Program, who "reiterated Dr. Pohll's testimony that the consumption figures of 3.10 acre-feet per acre accounted for variable weather situations, [evapotranspiration], and regular cuttings."[16] The Nevada

---

[16] The NIWR itself accounts for variable irrigation start dates:

> Defining the length of the growing season, time to effective full cover, and harvest dates are all important aspects of estimating [actual evapotranspiration] and the NIWR. . . .

> Calibration of [Cumulative Growing Degree Days], [the thirty-day moving average of mean daily air temperature], percent time from effective full cover to harvest days, and days after effective full cover to harvest, for simulating greenup and harvest dates was ultimately accomplished by minimizing the error in simulated vs. documented/typical greenup, planting, and harvest dates outlined in Table 4, which lists the results and specific information used in the calibration.

NIWR Report at 42–44.

State Engineer found that "Dr. Pohll's interpretation of the methodology of the NIWR is correct, and that the NIWR consumptive use figure of 3.10 acre-feet per acre in the Walker River Basin for alfalfa takes into account a variable irrigation start date and multiple simulated cuttings during the irrigation season."  The Nevada State Engineer found that the Commissioners' and the Farmers' arguments "concerning impacts to new land storage rights are addressed within the calculation of the 3.10 acre-feet per acre consumptive use amount."

The Decree court failed to defer to the findings of the Nevada Engineer, whose findings are presumed correct. NEV. REV. STAT. § 533.450(9)–(10); *Alpine Land & Reservoir Co.*, 919 F. Supp. at 1474; *Morris*, 819 P.2d at 205.  Once we consider the record before the Nevada State Engineer, the Decree court's concerns are unfounded, and the Nevada State Engineer properly found that "a transfer [to NFWF] limited to the consumption portion . . . would avoid conflict and injury to other existing water rights."  Because these findings are supported by substantial evidence and the State Engineer applied the correct legal rule, the Engineer's conclusions are entitled to deference.  It was error for the Decree court to reject those conclusions.

To the extent the Decree court made its own findings of fact, those findings are clearly erroneous.  The Decree court found that there was a difference between NFWF's proposed per second consumption rate (cfs) and its annual consumptive volume (afa).  The Nevada State Engineer concluded there was not, and the math bears this out.  NFWF's stipulated flow of 4.122 cfs, if called for continuously over the irrigation season, does not exceed the annual consumptive use volume of 3.1 afa.  They are identical.  We convert the stipulated flow

and consumptive use volume into total acre-feet of water per irrigation season, and compare.  To determine the total volume of water delivered to Walker Lake if the stipulated cfs is continuously called for, we multiply the stipulated flow (4.122 cfs) by seconds in a day (86,400 s), and then by days in the irrigation season (245 d),[17] which produces 87,254,496 cubic-feet or 2,003.091 acre-feet.[18]  To determine the total volume of irrigated water previously consumed per irrigation season in acre-feet, we multiply the total acreage of farmland whose decreed claims NFWF acquired (646.160 acres), by the consumptive use by each acre (3.1 afa).  That produces a volume of 2,003.096 acre-feet of water.  If NFWF were to call for a continuous flow of its maximum diversion rate of 4.122 cfs during the entire irrigation season, the total amount of program water will be 0.005 acre-feet less than that consumptively used by its predecessors-in-interest, which appears to be a rounding error.  Whether we calculate the program water as a rate (cfs) or as a volume (afa), the quantities are the same.  The Decree court erred in when it concluded  that the Nevada State Engineer had not accounted for the harvest days.

The Decree court's rejection of the California Control Board's ruling was also error.  WRID holds combined licenses to store between 71,310 and 76,060 acre-feet of water annually.  It requested permission to use up to

---

[17] The irrigation season is 245 days from March 1 to October 31. *See* Decree Art. XVI, amended (1940); Walker River Irrigation District, RULES AND REGULATIONS GOVERNING THE DISTRIBUTION AND USE OF WATER § 9.1, http://www.wrid.us/WRID/rulesandregs.

[18] One acre-foot equals 43,560 cubic-feet.  87,254,496 divided by 43,560 equals 2,003.091.

25,000 acre-feet of water stored at the Bridgeport and Topaz Reservoirs for in-stream use at Walker Lake.  The California Control Board approved the temporary permit, finding that the amount of storage water in the transfer would be limited to water that would otherwise be consumed or stored by WRID, and thus no injury would occur.  The Board found that the Farmers objecting to WRID's proposed change did not have "any right under contract or otherwise, to the stored water," and thus could not be injured by the proposed change in use.  According to the Board, stored water is considered an artificial flow, and a downstream user has no right to the discharge of stored water.

The Decree court rejected the Board's conclusions and substituted its own conclusion that WRID's temporary permit to release stored water would injure "junior storage right[s]" because WRID was "reduc[ing] stored water that would otherwise be available to a user with storage rights."  The court  concluded that WRID's proposal thus ran afoul of the "no injury rule."  The court's reliance on injury to "junior storage right holders" is misplaced, both as a matter of the Decree and California law.  The Decree's "no injury" rule refers to "injury to the *rights* of other parties hereto, as the same are fixed thereby."  Art. X (emphasis added). The no injury rule does not extend to persons who do not have decreed rights.  Under Section VIII of the Decree, WRID is declared to be "the owner of the flow and use of the flood waters of East Walker River and its tributaries for storage in Bridgeport Reservoir"; it likewise is the owner of the flood waters of the West Walker River for storage in the Topaz Reservoir.  Any permits issued to WRID by the California Control Board are "subject to vested prior rights" and stored water must be distributed "to the lands in the District entitled thereto, in accordance with their respective rights."

Accordingly, the Decree gives WRID distribution rights over the stored water, which it must exercise consistent with the Decree and Nevada law.   The Decree recognizes appropriative and storage rights in numerous private parties throughout the Walker River Basin, but it gives WRID alone the right to store and distribute the waters of Topaz and Bridgeport.

California's no injury rule is codified in various sections of California's Water Code, each of which prohibits injury to a "*legal* user of water." CAL. WATER CODE §§ 1701(b)(2), 1725, 1727(b)(1) (emphasis added). But under California law, "appropriators have no right to water stored by the irrigation districts." *State Water Res. Control Bd. Cases*, 39 Cal. Rptr. 3d at 244. "When [ ] stored water is released to customers, it is not part of the river's natural flow and does not count towards the appropriators current allocation of river water." *Id.*; *see also Stevens*, 9 P.2d at 61 ("The producer of an artificial flow is for the most part under no obligation to lower claimants to continue to maintain it. . . . [L]ower users will not have acquired a right against him, either by appropriation or prescription, to continued augmentation of the natural volume of the stream"); *Lindblom v. Round Valley Water Co.*, 173 P. 994, 997 (Cal. 1918) (holding that an appropriator "cannot require [a reservoir owner] to discharge any water into the stream during those months in which there would be no flow if no dam had ever been built.").

We know of no principle in California law that recognizes "storage rights" in a reservoir, outside of the reservoir owner. Insofar as the Farmers complaining here hold no decreed rights to the waters WRID is storing, they cannot claim any legal injury caused by changes to how and where WRID distributes flow to the rightsholders of decreed, appropriative

rights.  As the California Control Board explained "[i]t is not enough for a water user to show that it will receive less water as a result of the change.  Instead, a water use claiming injury must demonstrate that it has a right to the greater amount of water claimed and that the proposed change will interfere with that right."  The Control Board found that "[n]one of the [objectors] have demonstrated any right, under contract or otherwise, to the stored water that will be injured by the proposed temporary change," and that the "[l]andowners in [WRID] will continue to be allocated their portion of the stored water."  It thus concluded that "[o]nce the water is diverted to storage in a manner consistent with water right priorities, water stored in Topaz and Bridgeport Reservoirs is previously stored water to which the [objectors] have not demonstrated any legal interest."  In sum, the Control Board found that the proposed changes "would not injure any legal use of the water."  That finding is consistent with the Decree and in accord with California law, and it was error for the Decree court to refuse to approve the California Control Board's Report approving WRID's change application.

B.  *The Basin*

Under Article XIV of the Decree, "no water shall be sold or delivered outside of the basin of the Walker River."  The Water Commissioners argue, and the Decree court held, that delivering river water to Walker Lake would violate this export restriction, because the Lake is "outside of the basin of the Walker River."  The court's interpretation rested on several grounds: that there are no decreed rights to appropriate water from the Lake; that the Decree does not mention the Lake, but rather mentions other lakes as tributaries to the River; and that the Decree concerns appropriative rights only to the River and its tributaries, but

not the Lake.  On this basis the court held that "basin," as used in the export restriction, unambiguously refers only to those agricultural lands that beneficially use the River's waters and those waters that are mentioned by name in the Decree, but not the Lake itself.  By contrast, both the Nevada State Engineer and the California Control Board found that Walker Lake was within the Walker River Basin.

The Walker River Decree is a partially stipulated decree, and so we interpret its provisions in a manner consistent with the entirety of the decree, and without the aid of extrinsic materials unless the provisions are ambiguous. *Wackerman Dairy, Inc. v. Wilson*, 7 F.3d 891, 897 n.13 (9th Cir. 1993). Provisions are ambiguous where they are subject to two or more reasonable interpretations. *See Frei ex rel. Frei v. Goodsell*, 305 P.3d 70, 73–74 (Nev. 2013); *State v. Cont'l Ins. Co.*, 281 P.3d 1000, 1004 (Cal. 2012).

The district court correctly noted that the export restriction ensures that the basin's waters remain in the basin for beneficial use by appropriative rightsholders.  Such a protectionist measure appears elsewhere in water law as a mechanism to preserve water resources for local use. *See*, *e.g.*, COLO. REV. STAT. § 37-81-101 (prohibiting the export of river waters outside Colorado to ensure "adequate supplies of water necessary to insure the continued health, welfare, and safety of all its citizens").

We do not think there is any ambiguity in the phrase "basin of the Walker River."  Consider the plain hydrological, geomorphic, geographic, and everyday meaning of the word "basin."  A "basin," as we commonly use that word, is simply the geographic area that is coextensive with a river system's hydrological drainage.  The Decree court itself used the term

"basin" according to this plain hydrological and geographic meaning, when it opened its Order by observing that the Walker River Basin is approximately 4,050 square miles "from its origins in the southwestern elevations of the Sierra Nevada Mountains to its terminus, Walker Lake."

Even if the term "basin" were ambiguous, interested extrinsic sources support the interpretation urged by NFWF and found by the Nevada State Engineer and the California Control Board. The State of Nevada refers to the Walker River Basin, including Walker Lake, as "Hydrographic Region No. 9."[19] The USGS calls it "Accounting Unit 160503," composed of hydrological sub-units East Walker, West Walker, Walker, and Walker Lake.[20] And the USGS's Nevada Water Science Center places the Lake at "the lowest point in the basin."[21] Additionally, the Nevada Supreme Court views the Lake as part of the Walker River system and subject to the Decree court's jurisdiction.[22] The Decree court itself once noted that the Basin includes "sub-basin[] . . .

---

[19] *See* Nev. Dep't of Conservation & Nat'l Res., DESIGNATED GROUNDWATER BASINS OF NEVADA (2017), http://water.nv.gov/mapping/maps/designated_basinmap.pdf.

[20] Paul R. Seaber, et al., USGS, HYDROLOGIC UNIT MAPS 54 (1994), https://pubs.usgs.gov/wsp/wsp2294/pdf/wsp_2294.pdf; *id.*, Plate 1, https://pubs.usgs.gov/wsp/2294/plate-1.pdf.

[21] Kip K. Allander, *et al.*, USGS, United States Dep't of the Int., EVAPOTRANSPIRATION FROM THE LOWER WALKER RIVER BASIN, WEST-CENTRAL NEVADA, WATER YEARS 2005-07 5 (2009), https://pubs.usgs.gov/sir/2009/5079/pdf/sir20095079.pdf.

[22] *Mineral County*, 20 P.3d at 805–06.

110B," which the State of Nevada titled the "Lake Subarea."[23] Congress understood no differently when it enacted the legislation to save Walker Lake under the aptly titled Walker Basin Restoration Program.  Pub.  L. No. 111-85, §§ 207–08, 123 Stat. 2845, 2858–60 (2009).

The Commissioners point to a 1935 opinion of the Decree court, in which Judge St. Sure described his happy "tour of the Walker River basin" and referred to his visit to "the valleys, meadows, the Walker Indian Reservation, the storage reservoirs, a site of a proposed reservoir, and points of diversion of waters for irrigation," but omitted any reference to the Lake.  *United States v. Walker River Irr. Dist.*, 11 F. Supp. 158, 162 (D. Nev. 1935).  They also point to statements made by counsel in the 1930s, in which they mentioned the Basin, but not the Lake.  We give little weight to these anecdotal statements.  The Decree's export restriction is not structured as an inclusionary list of those places to which water may be sent.  That Walker Lake itself—an obvious and dominant physical feature in the Basin—was not mentioned by the court or counsel means little in light of the Decree's text and purpose.  The Commissioners' interpretation flies in the face of history and logic and that ancient and simple maxim *aqua currit et debet currere ut currere solebat ex jure naturae*: water runs and ought to run as it is accustomed to run, according to the law of nature.  Wholey v. Caldwell, 41 P. 31, 32 (Cal. 1895); *Lux v. Haggin*, 4 P. 919, 920 (Cal. 1884); *Lobdell*, 2 Nev. at 276.  We conclude that Walker Lake is part of the Walker River Basin.  As a consequence,

---

[23] *Compare United States v. Walker River Irr. Dist.*, 2002 WL 35634154, at *1 (D. Nev. Apr. 26, 2002), *with* Nev. Dep't of Conservation & Nat'l Res., DESIGNATED GROUNDWATER BASINS OF NEVADA (2017), *supra* note 19.

dedicating water from the Walker River to Walker Lake does not violate the Decree's prohibition on delivering water "outside of the basin of the Walker River."

## IV.  CONCLUSION

The judgment of the Decree court is reversed.  We vacate the opinion below and remand with instructions to grant the Petition to Confirm Nevada State Engineer Ruling No. 6271 of March 20, 2014, grant the Petition to Confirm California State Water Resources Control Board Report of May 29, 2014, and modify the Decree accordingly as necessary.

**REVERSED** and **REMANDED.**